James EARLE, Plaintiff, Appellant,

v.

Robert BENOIT, et al.,
Defendants, Appellees.

No. 87–1167.

United States Court of Appeals,
First Circuit.

Heard Oct. 9, 1987.
Decided June 29, 1988.

Joel Pentlarge with whom Walker &
Pentlarge, Ware, Mass., and John Rein-
stein, Massachusetts Civ. Liberties Union,

Boston, Mass., were on brief, for plaintiff, appellant.

Richard L. Zisson with whom Daniel R. Cox, Jr., Zisson and Veara and J. Richard Ratcliffe, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Plaintiff appeals from the district court's adverse judgment in his civil rights action against state police officers. Among the issues raised on appeal are when in a civil conspiracy case the judge may make a determination under Fed.R.Evid. 801(d)(2)(E) that a declarant was *not* a member of a conspiracy. *Compare Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. Ciampaglia,* 628 F.2d 632 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980); *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977).

## I.

In 1980 and 1981, plaintiff James Earle was several times stopped, arrested, searched and charged with traffic and criminal violations by troopers of the Massachusetts State Police and by police officers from the town of North Brookfield, Massachusetts. He brought this district court action under 42 U.S.C. § 1983 (1982) against three Massachusetts State Police Troopers, Robert Benoit, James Jaworek, and Phillip Rembiszewski ("the state troopers"), and three North Brookfield Police Officers, Chief Harbig Thomasian, Gerald St. John, and Peter Fullam ("the town officers"). He alleged that the defendants had conspired to deprive and did deprive him of his constitutional rights, over a period of about a year, by subjecting him to unlawful arrests and prosecutions, by interfering with his freedom of speech, by subjecting him to unreasonable searches and seizures,

by assaulting and physically abusing him, and by repeatedly harassing him.

Prior to trial, the claims against the three town officers were settled.[1] Trial ensued against the three state troopers.

Early in the trial, the district court granted defendants' pre-trial motion in limine to prevent Earle from presenting evidence and commenting thereon regarding plaintiff's claim that Trooper Benoit had charged or arrested him for violation of an allegedly unconstitutional by-law of the Town of North Brookfield. The court also granted a similar request to prevent the presenting of evidence regarding Earle's claim that Trooper Benoit had illegally arrested him for trespassing at the North Brookfield State Police barracks.

Plaintiff's first and principal witness was Earle himself, who testified, inter alia, to conversations he had had with Officer St. John and Chief Thomasian. During the first day of trial, midway through Earle's testimony, the court granted defendants' motion to strike all evidence as to statements made by the town officers. The court stated that Earle had not connected the town officers to a conspiracy with the defendant state troopers. At the conclusion of plaintiff's evidence, the court directed a verdict for all three defendants on the civil rights conspiracy count and for defendant Trooper Rembiszewski on all other counts against him. The jury later returned a verdict responding negatively to special questions inquiring whether the remaining defendants, Troopers Benoit and Jaworek, had violated Earle's civil rights when Benoit searched and arrested Earle on August 7, 1980, and when Jaworek stopped and searched Earle's vehicle on September 6, 1980.

Earle contends on appeal that the district court erred in excluding evidence of the town officers' statements and in directing a verdict in favor of the defendants on the civil rights conspiracy count. He further alleges error in the district court's rulings, made at the beginning of the case, exclud-

---

1. The three town officers paid $6,500 to plaintiff, and the claims against them were dismissed with prejudice.

ing all evidence relating to plaintiff's claim that Trooper Benoit violated his civil rights by bringing charges against him for violating a town by-law and by arresting him for trespassing at the State Police barracks.

## II.

Earle testified to a series of incidents which, he contends, sufficed to establish that defendants conspired to deprive him of his civil rights.[2] The first incident, and the one that plaintiff argues triggered the chain of events about which he is here complaining, took place in North Brookfield, Massachusetts, late in the evening of August 7, 1980. Approximately a dozen young people gathered along the sidewalk and common on Main Street. Trooper Benoit, of the State Police, approached the group and began searching one of the members of the group, a young woman named Kathy Baldyga. She had a leather pouch hanging from her belt. Trooper Benoit searched the pouch and found a marijuana pipe. At this time Earle, who was walking down the street with his dog, observed Benoit's search of Baldyga. Earle told Benoit that he should not be searching a woman, that a female officer should be called to make such a search. Benoit thereupon approached Earle, tapped his pocket and felt something in it. Reaching into Earle's pocket, Benoit pulled out a cigarette lighter and a plastic bag containing marijuana. Earle was immediately placed under arrest for possession of marijuana and handcuffed. Officer Gerald St. John, of the town police, arrived on the scene at this time. After searching the other members of the group, Trooper Benoit took Earle to the Brookfield State Police barracks. In the barracks Earle repeatedly refused to give his name to the police. Earle testified that in the process of interrogating him, Benoit grabbed him by the hair, dragged him from the interrogation room to a cell, and threw him on the floor. Later that night Benoit allegedly conducted a strip search of Earle.

Concerned about the previous night's incidents, Earle went the next day to see Officer St. John, the local officer who had backed up Trooper Benoit the previous evening. Instead of talking about the preceding night's incident, St. John and Earle had an argument about a different incident. St. John told Earle that the tires of his (St. John's) car had been slashed and that he wanted Earle to help him find the culprit. Earle responded that he did not know who had slashed the tires and that he was not going to help him find out who did it. St. John gave Earle two days to find out who slashed the tires and threatened to bring Trooper Benoit to the town every night until St. John found out who slashed the tires.

The following night, August 9, around 11:30 p.m., Earle was stopped by Trooper Benoit. Earle was giving two girls a ride home from a party. One Michael Fortin was with them in the car. Earle stopped in a parking lot to drop off the two girls when Benoit approached Earle's van. After inspecting Earle's driver's license and car registration, Benoit ordered Earle to get out of the van. Earle refused to do so. Michael Fortin, the other passenger, also refused to get out of the van. Shortly thereafter Officer Fullam, of the town police, arrived. Upon Fullam's request, Fortin finally got out of the van. Benoit asked the two girls, who were under 18, if they had been drinking.[3] They answered "no," and he let them go home. Benoit ordered Fortin, who admitted to having been drink-

---

**2.** We state here the highlights of Earle's version of events. After Earle and several supporting witnesses had testified, defendant state troopers presented their own version of the incidents. The troopers' evidence questioned Earle's version in various particulars and reinforced their position that Earle and his associates had engaged in acts of hooliganism, drug possession, and so on, and that the troopers, in view of their law enforcement responsibilities, had responded legitimately. There was undisputed evidence

that during the Labor Day weekend of 1980, several fires were set in North Brookfield. Brian Connolly, a friend of Earle's, who was also convicted of a drug offense, was convicted, along with others, of arson. Trooper Rembiszewski testified to observing Earle standing across from a cemetery where several fires were set.

**3.** Subsequent evidence indicated they were 14.

ing, to go directly to his home. Benoit threatened to bring charges against Earle if he ever found that Earle had purchased alcohol for the girls. Trooper Benoit and Officer Fullam left without searching or arresting Earle.

Early on the evening of September 6, 1980, Trooper James Jaworek of the State Police stopped plaintiff for driving without headlights. While writing up a ticket, Jaworek allegedly smelled marijuana inside the van. He searched the van and found a nightstick and a bag containing marijuana. Earle was placed under arrest. Plaintiff alleges that inside the trooper's cruiser he observed a clipboard with a piece of paper with his name on it, a description of his van, and a note stating that Earle had stolen Benoit's police hat.

Earle was followed by Benoit on two separate occasions on September 7, 1980. He was neither stopped nor arrested. On September 21, 1980, Officer Fullam brought charges of disturbing the peace against plaintiff because the latter refused to set up a bicycle rack that was knocked over by a third person. The next day Earle was arrested by Officer St. John for unlawful assembly because he refused to dissolve a group that was standing in front of the Town Hall.

On four other occasions Benoit stopped plaintiff because of alleged traffic violations. On September 4, 1980, Trooper Benoit gave plaintiff a bald tire ticket. Plaintiff testified that all of his tires were in good condition and that Benoit did not examine any of his tires before writing up the ticket because a fellow officer told him that Earle's van had a bald tire. On another occasion Benoit stopped Earle because he was driving with a defective muffler. Earle admitted that he was driving with an excessively loud exhaust system. While Benoit was writing up a repair ticket, an unknown state trooper arrived at the scene. This unknown trooper alleged that he smelled marijuana inside the van, and conducted a search. Nothing illegal was found inside the van. Earle was not arrested or charged with any crime.

Plaintiff had three conversations with Harbig Thomasian, the Police Chief of the Town of North Brookfield. Approximately a week after the first incident, Earle complained to Thomasian about the problems he was having with the police. Chief Thomasian first accused Earle of being a drug dealer, but went on to say that it was Earle's "big mouth" that got him in trouble and that the police would appreciate any cooperation he could furnish with regard to one Brian Connolly, who had been present the night of the August 7 incident (when plaintiff was arrested for the first time), and who the police suspected was selling drugs in the town. Chief Thomasian told plaintiff that if he would cooperate with the police in getting Connolly, things would go much easier for him. Plaintiff had a second conversation with Chief Thomasian on October 20, 1980, when he was arrested for defacing a gravestone. Earle asserts that while he was handcuffed, Chief Thomasian threatened him with a baseball bat and again requested his cooperation to implicate Connolly. Several months later Earle had a final meeting with Chief Thomasian. The Chief reiterated that Connolly was the source of Earle's problems. He stated that Trooper Benoit would be at a particular spot in town and that Earle should go there to talk to Benoit and solve their problems. Earle went to the place indicated by Thomasian. Benoit was there, but plaintiff was not able to talk to him.

On August 21, 1981, Earle was coming out of a local bar when he saw Trooper Rembiszewski, Officer Fullam, and several other state troopers. Rembiszewski called Earle "scum" and asked if he knew where the Spencer courthouse was and said, "You never lost a case, either, have you?" Earle said no, and Rembiszewski responded, "Well, somebody around here isn't doing their job, isn't that right, Peter," talking to Officer Peter Fullam. Rembiszewski made other comments about plaintiff, invited the latter to fight and threatened to arrest him.

As indicated in note 1, *supra*, there was additional evidence concerning the above and other incidents. Defendants' evidence negatived certain aspects of Earle's evidence and suggested that Earle and his

friends were troublemakers and the officers' reactions a reasonable police response to disruptive and suspicious activity.

## III.

The theory of Earle's dismissed civil conspiracy claim under 42 U.S.C. § 1983 was that the defendant state troopers, and the three town officers with whom a pre-trial settlement was effected, were engaged in a conspiracy to violate his civil rights—in particular, to harass him illegally through the medium of unwarranted arrests, searches, stops, etc. The alleged motive behind the conspiracy was police resentment of Earle's challenge to their authority and also the desire of the police to secure his cooperation in informing on others, particularly on Brian Connolly. Defendants respond that it is sheer speculation to postulate a "conspiracy" theory to explain their actions: in defendants' view, Earle's own actions were reason enough for the law enforcement officers to react as they did.

## IV.

We turn first to the court's ruling that struck all evidence of statements by the town officers. When Earle began his testimony at the beginning of the trial, the court overruled defendants' objections to Earle's references to conversations with the town officers. The court said that Earle would be granted leeway to testify to his encounters and conversations with these officers, subject to his showing how they tied in to the purported conspiracy and to the three defendant troopers. Earle was thus permitted to relate Officer St. John's threat to bring Trooper Benoit into town every night until the person who had slashed St. John's tires was found. He also testified about his conversations with Chief Thomasian, including the Chief's request that Earle help "get" Brian Connolly. However, after Earle recounted the latter the court stated that it had yet to hear any evidence that would warrant finding a connection between the three state troopers and the statements attributed to the town officers. In a bench conference, the court sought an offer of proof but was persuaded by Earle's counsel to allow more testimony directly from Earle himself concerning his conversations with the town officers before it ruled finally on whether to admit them. Earle accordingly went on to recount in open court additional conversations with Chief Thomasian, including the incident in which he was taken to the police station and the Chief supposedly swung a baseball bat near his head. At this point, stating there was "absolutely no connection to the state troopers on trial in this civil rights case," the district court instructed the jury to disregard all testimony of arrests and conversations relating to the town officers.

In urging the admissibility of evidence of the town officers' remarks, counsel for Earle relied on Fed.R.Evid. 801(d)(2)(E) which provides that "a statement by a coconspirator of a party made during the course and in furtherance of the conspiracy," and offered against the party is not hearsay.[4] The determinations in applying this rule are made by the judge, not the jury. *Bourjaily v. United States*, 107 S.Ct. at 2778; *United States v. Petrozziello*, 548 F.2d 20, 22–23 (1st Cir.1977). By the interplay of Fed.R.Evid. 104(a)[5] and

---

**4.** Fed.R.Evid. 801(d)(2)(E) reads

    **(d) Statements which are not hearsay.** A statement is not hearsay if—

    . . . .

    **(2) Admission by party-opponent.** The statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

**5.** Fed.R.Evid. 104(a) and (b) read as follows:

    **(a) Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

    **(b) Relevancy conditioned on fact.** When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Fed.R.Evid. 801(d)(2)(E), an out-of-court statement of an alleged co-conspirator will be admissible only if the judge makes a preliminary "determination" that the statement was made "(1) during the course and (2) in furtherance (3) of a conspiracy (4) of which declarant is a member." 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 104[05], at 104–39 (1986). The judge may determine the presence or absence of these key factors not only from admissible evidence but from hearsay and other inadmissible evidence, including the offered statements themselves. Fed.R.Evid. 104(a); *Bourjaily,* 107 S.Ct. at 2779–82; *Petrozziello,* 548 F.2d at 23.

The district court makes its determination in accordance with the civil preponderance of evidence standard, *i.e.,* "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy, the hearsay is admissible." *Petrozziello,* 548 F.2d at 23.[6]

Earle attacks the district court's exclusion of the town officers' out-of-court statements on two grounds. He says it was a mistake for the district court to make its determination excluding the town officers' conversations long before the close of all the evidence. Supposedly this was contrary to the procedure established by this court in *United States v. Ciampaglia,* 628 F.2d 632, 637–38 (1st Cir.1980). Earle alternatively argues that even the evidence before the court when it made its ruling required a finding that there was more likely than not a conspiracy between the town officers and the defendants of which the stricken statements were in furtherance.

■ Turning first to the timing of the court's preliminary ruling, we find no error. This is not a situation parallel to that in *Ciampaglia,* a criminal case, in which we held that the district court should postpone its *final* determination upholding the existence of a conspiracy to which defendant and declarant belonged, until after the defense had a chance to put in its evidence. 628 F.2d at 638. While allowing the prosecution to *conditionally* present the coconspirators' declarations, we required the court to delay its final *Petrozziello* determination until the close of all evidence. The *Ciampaglia* rule stemmed from concern that a court's *final* determination of the existence of a conspiracy, permitting co-conspirators' conversations to come in, could unfairly prejudice the accused if made before he had a chance to present his own evidence rebutting the existence of a conspiracy. But nothing in *Ciampaglia* forbids a district court from concluding earlier in a case that since the proponent has failed to point to adequate evidence of a conspiracy to which the out-of-court declarant belonged, the declarant's statements are inadmissible. A court, to be sure, is obliged to provide the proposing party a fair and reasonable opportunity to make the requisite preliminary showing, but this may be done in a variety of ways depending on the circumstances.[7]

---

**6.** Although most of the cases discussing the co-conspirator evidentiary exception are criminal, the exception is equally applicable in civil cases. Fed.R.Evid. 1101(b). *See, e.g., Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1267 (9th Cir.), *cert. denied,* 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983); *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 80–81 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981); *SEC v. Tome,* 638 F.Supp. 629, 633 (S.D.N.Y.1986). By the same token, the preponderance of evidence standard governs the court's preliminary rulings under Rule 801(d)(2)(E) in civil as in criminal cases. *See Bourjaily v. United States,* 107 S.Ct. at 2779 ("the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case ... or a civil case") (citations omitted);

*James R. Snyder Co. v. Associated General Contractors of America,* 677 F.2d 1111, 1117 (6th Cir.), *cert. denied,* 459 U.S. 1015, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982) (holding that the preponderance of the evidence standard should be used to make a Rule 801(d)(2)(E) determination in civil as well as criminal cases). *But see SEC v. Tome,* 638 F.Supp. at 634 (stating in dicta that a different standard under Rule 801(d)(2)(E) should be applied in civil and criminal cases). We think Justice Rehnquist's opinion for the Court in *Bourjaily* makes the earlier *Tome* dicta untenable.

**7.** That *Ciampaglia* was not intended to place the district court in a straightjacket is made clear from the following:

We think Earle was given a reasonable and fair opportunity to demonstrate here that the town officers were coconspirators with the troopers. The defendants had filed a pre-trial motion in limine seeking the exclusion of the town officers' statements. Rather than ruling on the motion before trial, the court allowed Earle to take the stand before judge and jury, and to testify conditionally at some length concerning his encounters with the town officers. The court indicated to counsel at this time that it would expect Earle, in the course of this testimony, to establish a relationship between the evidence relating to the conduct and remarks of the town officers and Earle's claims against the state troopers. Earle testified in extenso, and there were hearings out of the jury's presence at which plaintiff's counsel was invited to point to any further evidence he had to establish a conspiracy between the defendants and town officers.[8] In *Bourjaily*, the Supreme Court made it clear that the trial court's determination of the existence of a conspiracy, and of declarant's participation therein, is a preliminary ruling on "whether the evidentiary Rules have been satisfied," not a resolution of the merits of the case. 107 S.Ct. at 2779. While the Court specifically declined to "express an opinion on the proper order of proof that trial courts should follow," *id.* at 2779 n. 1, we think a district court has considerable discretion over the order of proof in a civil case like this, provided it grants to the proponent a fair and sufficient opportunity to call to the court's attention his evidence of conspiracy and of declarant's involvement therein. *See Paul T. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1121 (5th Cir. 1980) (courts have greater leeway in controlling the order of proof in civil conspiracy cases than in criminal). We find no error in the procedure followed by the lower court.

We turn next to Earle's argument that, in any event, the district court erred in refusing to find, on the evidence it then had before it, that the town officers were more likely than not co-conspirators with the defendants, and that their statements were made during the course and in furtherance of that conspiracy, and hence were admissible under Rule 801(d)(2)(E).

In deciding whether a preponderance of the evidence indicated a conspiracy between defendants and the town officers, of which the latter's remarks were in furtherance, the district court was required to weigh the evidence and assess its credibility. *Bourjaily v. United States*, 107 S.Ct. at 2778–79. No longer does a judge simply determine whether the proponent has made out a prima facie case of conspiracy and related elements, and, if so, send all matters to the jury for *its* determination. As this court said in *Petrozziello*, "[F]inding a prima facie case is not the same as determining that a conspiracy existed." 548 F.2d at 23. Today's trial court must make its own preliminary judgment concerning the existence or nonexistence of the Rule 801(d)(2)(E) elements. And, on appeal from that determination, this court must sustain the lower court's findings unless they were clearly erroneous. *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir.1984).

Although the lower court's stated reasoning was more cryptic than we would prefer, we think the court understood its factfinding role and was exercising it when rejecting the town officers' statements.[9]

We do not intend to imply that district courts may not in appropriate cases follow alternative procedures pursuant to Fed.R. Evid. 104 in order to determine the admissibility of evidence under Fed.R.Evid. 801 so long as a proper "preponderance" ruling is made.
628 F.2d at 638 n. 3.

8. We note that the court had before it the complaint, which set out in some detail plaintiff's version of most of the incidents involving the town officers and the defendants upon which plaintiff's conspiracy claim rested. These were amplified in defendants' answers and the motion in limine and in plaintiff's written response to the motion, all of which materials were submitted before trial.

9. For example, early in the trial, counsel for Earle reminded the court,
    MR. PENTLARGE: ... Alleged co-conspirators are not hearsay. And they are admissible against the other conspirators.
    THE COURT: If shown and proved.
    MR. PENTLARGE: That's correct.

We are also satisfied that the district court did not commit clear error in refusing to make a preliminary finding of a conspiracy between the town officers and defendants of which the former's statements were in furtherance. To be sure, the agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances. And, as the Supreme Court said in *Bourjaily*— in holding that the hearsay statements of co-conspirators may constitute a part of the evidentiary fabric from which a threshold conspiracy finding is made—"individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." 107 S.Ct. at 2781. Thus, in the present case, plaintiff urges us to infer from Officer St. John's threat to bring in Trooper Benoit every night until St. John found out who slashed his tires, that there was a covert agreement between St. John and Trooper Benoit to harass Earle. Similarly, Chief Thomasian's alleged advice to Earle that his "big mouth" and his relationship with Brian Connolly had gotten him in trouble, and asking for his help against Connolly, could be the basis for inferring that the town police were seeking to "get" Connolly, and that Trooper Benoit's stopping of Earle on various occasions was part of a scheme to pressure him into providing assistance in that project.

But while these and other incidents could conceivably be susceptible of plaintiff's interpretation, there were other factors which strongly militated against an inference of conspiracy. Benoit and the other state troopers were based in Brookfield. They shared law enforcement responsibilities in the area with the local police. If Earle and his associates were disruptive and gave grounds to suspect them of violations of the law, including arson and drug use and dealing, the troopers had a duty to investigate and take appropriate measures to protect the community; doing so did not imply a conspiratorial "agreement" with the town officers. Even Earle's own testimony strongly suggested that his conduct was of a kind that would likely attract the attention of normal law-abiding policemen. In two of the incidents Earle described, he was found in possession of marijuana. It could be inferred that his attitude, language and conduct were unusually confrontational, and that he associated publicly with an unruly non-law-abiding crowd. Instead of being part of an illegal agreement to violate Earle's civil rights, the actions of the police towards Earle could easily be viewed, on the basis of Earle's own description of events, as the understandable if imperfectly calibrated efforts of peace officers to perform their jobs. Even if individual officers overreacted on a few occasions, this would not compel the conclusion of an *agreement* to violate Earle's civil rights, given the fact that Earle was an object of reasonable police concern and suspicion.

The district judge heard Earle's testimony and could assess his credibility. The judge was in a better position than we are to decide whether to interpret the evidence, on the one hand, as reflective of a conspiracy between the state troopers and the town officers to violate Earle's civil rights, or, on the other, as reflective merely of a continuing attempt by different law enforcement officers, acting as such, to cope with someone they had good reason to regard as a scofflaw.

We observe further that the evidence of an agreement between the local police and defendants was sparse at best. Even assuming arguendo that the local officers had plans to harass Earle, the court was not compelled to infer that defendants were a part of these plans. That the troopers, especially Benoit, stopped and detained Earle on a number of occasions, and sometimes called the town officers as backup, can as plausibly be explained by the troopers' individual reactions to Earle, in the course of their duties, as by some common scheme between town and state officers to harass him.

The district court's determination refusing to admit evidence of the local officers' declarations was not clearly erroneous, and we therefore sustain it.

THE COURT: *And believed.*

(Emphasis supplied.)

## V.

The court's rejection of the out-of-court statements of the town officers, a ruling made in the middle of Earle's testimony, was followed by the court's direction of a defendants' verdict on the conspiracy count. This occurred upon the conclusion of plaintiff's evidence. Later, the case was submitted to the jury on special questions going to two of the incidents brought out at trial—Trooper Benoit's search and arrest of Earle on August 7, 1980, and Trooper Jaworek's stopping and search of Earle's van on September 6, 1980. The gist of the special questions, which are set out in Appendix A attached to this opinion, was whether either defendant had violated Earle's civil rights on those occasions. The jury, after deliberating for approximately three hours, answered all questions in the negative.

■ Earle now contends that the district court erred when it refused, over Earle's objection, to submit his claim of a civil rights conspiracy to the jury. That claim— after the court's refusal to admit evidence of the town officers' statements and conduct—focused on the assertion that defendants, Troopers Benoit, Jaworek and Rembiszewski, had conspired with one another to violate, and did violate, Earle's federally protected rights, in violation of 42 U.S.C. § 1983.[10]

A civil rights conspiracy as commonly defined is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" *Hampton v. Hanrahan,* 600 F.2d 600, 620–21 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (quoting *Rotermund v. United States Steel Corp.,*

474 F.2d 1139 (8th Cir.1973)). This court has ruled that for a conspiracy to be actionable under section 1983 the plaintiff has to prove that "there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws." *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980). *See generally* S. Nahmod, *Civil Rights and Civil Liberties Litigation* § 2.11 (1986).

In considering the court's direction of a verdict on the conspiracy claim here, we note that the jury ultimately rejected plaintiff's claims of civil rights violations by Trooper Benoit on August 7, 1980, and by Trooper Jaworek on September 6, 1980. These were the incidents during which, based on Earle's version of what occurred, a jury could most obviously have found violations of federally protected rights. Thus Earle claimed that on August 7, 1980, Benoit had searched and arrested him illegally, without probable cause, and had used excessive force. And he claimed that on September 6, 1980, Jaworek had illegally stopped his van and had conducted a search that both lacked probable cause and was overly broad.

When the court directed a verdict on the conspiracy count it did not, of course, know that the jury would eventually find for defendants on the above claims of significant civil rights violations. The question before the court at the time it directed the verdict was whether—viewing matters most favorably to Earle—the then unresolved evidence of these two incidents, plus all remaining evidence, was sufficient to permit a reasonable jury to find a civil rights conspiracy "without speculation and conjecture." *Aubin v. Fudala,* 782 F.2d 280, 286 (1st Cir.1986) (quoting *Carlson v. American Safety Equipment Corp.,* 528 F.2d 384, 386 (1st Cir.1976), and *Schneider v. Chrysler Motor Corp.,* 401 F.2d 549, 555 (8th Cir.1968)). This was a close question. The August 7 and September 6 events, if

---

**10.** 42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

they had been resolved in Earle's favor by the jury, could have reflected actual deprivations of rights "secured by the Constitution and laws." *Landrigan,* 628 F.2d at 742. But there was no direct evidence of any *agreement* between the troopers, and the circumstantial evidence of an agreement was not strong. Still, it is not necessary to show an *express* agreement to prove a conspiracy. *Hampton v. Hanrahan,* 600 F.2d at 621. Taking the record as a whole, we believe there was sufficient circumstantial evidence (had the jury found in Earle's favor on the substantive claims) for a reasonable jury to have inferred a conspiracy among the three troopers. The court's direction of a verdict was, therefore, erroneous.

■ The next question is whether that error was harmless. We conclude that it was. The jury's ultimate determination that neither Trooper Benoit's search and arrest of Earle on August 7, nor Trooper Jaworek's stop and search of his van on September 6, violated Earle's civil rights, fatally eviscerated Earle's conspiracy claim. Without the civil rights violations these charges entailed—illegal arrest, use of excessive force, illegal searches—what remained was insufficient to support the required finding that Earle had been subjected to an "actual deprivation of a right secured by the Constitution and laws." *Id.* See also *Richardson v. City of Indianapolis,* 658 F.2d 494, 500 (7th Cir.1981) ("Because the jury determined that no violation of the decedent's civil rights had taken place as to the shooting defendants, there obviously could have been no agreement to violate those rights by the non-shooting defendants."), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982).

To be sure there remained evidence of several less serious confrontations between the state troopers and Earle on other occasions. Benoit stopped Earle's van on the evening of August 9, 1980, when Earle was transporting two 14 year old girls and a drunken friend. There was, however, no search and arrest. Benoit also stopped Earle for four alleged traffic violations. One of these, at least, for a bald tire, could have been found pretextual. Another, however, for a defective muffler, seems by Earle's own admission to have been justified. And Trooper Rembiszewski allegedly referred to Earle as "scum," invited him to fight and threatened to arrest him. We do not think the above, individually or collectively, arise to the level of deprivations of rights secured by the Constitution required for a civil rights conspiracy under 42 U.S.C. § 1983. Even supposing Benoit and Rembiszewski overstepped their authority on some of these occasions, not every transgression by a police officer violates the due process clause (or another provision) of the Constitution. *Paul v. Davis,* 424 U.S. 693, 699–701, 96 S.Ct. 1155, 1159–1161, 47 L.Ed. 2d 405 (1976); *Mark v. Caldwell,* 754 F.2d 1260, 1261 (5th Cir.), *cert. denied,* 474 U.S. 945, 106 S.Ct. 310, 88 L.Ed.2d 287 (1985); *Landrigan,* 628 F.2d at 744–46. Thus given the jury's determination that Benoit and Jaworek had committed no civil rights violations on August 7 and September 6, 1980, we do not think the jury was left with enough evidence to have found defendants liable for a civil rights conspiracy.

This ends the matter, but we add that it also seems inconceivable, as a practical matter, given the jury's consistently negative responses to the questions put to it (see Appendix A) concerning whether Troopers Benoit and Jaworek had violated Earle's civil rights on these two most serious occasions, that the jury would have found for plaintiff on the closely related conspiracy charge. Plaintiff had his day in court. He was permitted to present at least the hard core of his version to the jury and the jury was clearly not impressed.[11]

---

11. We hold in section VII that the court erred in refusing to proceed to trial with Earle's contention that he was arrested on September 27, 1980, at the Brookfield State Police barracks by defendant Benoit without probable cause. While an arrest without probable cause, if found, would have been a constitutional violation capable of sustaining a conspiracy claim, we are not persuaded that presentation of this single incident would have tipped the scales in respect to the conspiracy claim in any significant manner. The arrest was attributed solely

We hold that the court's error in refusing to allow the conspiracy charge against the troopers to go to the jury was harmless.

## VI.

Earle complains on appeal of the district court's refusal to consider what he describes in his brief as "Mr. Earle's claim that his arrest by Trooper Benoit, pursuant to a North Brookfield by-law prohibiting indecent or profane language, violated his constitutionally protected right to freedom of speech." The town by-law in question is identified in plaintiff's brief as "Chapter 14, Section 4." Neither the by-law nor the most elementary other facts pertaining to the alleged incident appear anywhere in the pleadings or record.

This near total lack of information precludes meaningful review of the lower court's refusal to proceed with the matter. The complaint itself, while detailing many other incidents, nowhere mentions that on a given date Trooper Benoit charged or arrested Earle for violating a designated Town of North Brookfield by-law prohibiting indecent or profane language, nor that said charge or arrest was allegedly improper because pursuant to an enactment that violated the First Amendment. The complaint merely alleges, in paragraph 18, that,

On a number of occasions the defendant, Trooper Robert Benoit, charged the plaintiff, James Earle, with violation of the Town By–Laws of the Town of North Brookfield....

The complaint later goes on to allege that James Earle "at all times relevant to this Complaint, was not engaged in disturbing the peace or in commission of any offense against the ordinances of any town or the laws of the Commonwealth of Massachusetts at the time of any of the arrests or Complaints above." The complaint also alleges generally that, "because of the above recited acts" (i.e., the various incidents set out in some 22 previous paragraphs),

to Benoit. Earle may now proceed with that claim against Benoit if he so chooses on an

Earle's civil rights were violated, including those under the First, Fourth, Sixth, Ninth and Tenth Amendments to the federal Constitution.

The most that could be gleaned from the above was that plaintiff complained, among many other things, that defendant Benoit had *charged* him with offenses, including violations of the North Brookfield by-laws, which he had never committed. There is no suggestion in the complaint that Benoit had violated Earle's free speech rights by charging or arresting him under a speech related town by-law which was itself unconstitutional.

Defendants may, however, have had inklings of such a claim. In their motion in limine (filed, as the name implies, before trial) they argued—as a ground for requesting the court to bar evidence of "any and all arrests ... for violations of North Brookfield by-laws—that they had qualified immunity, adding that this immunity was not vitiated by "[t]he fact that the North Brookfield town by-laws were declared unconstitutional...."

At the beginning of the trial, the following colloquy took place between plaintiff's counsel and the district court:

MR. PENTLARGE: .... There was a town by-law against obscene or offensive language. The contention of the state troopers is that although this town by-law was declared unconstitutional in the district court in these criminal proceedings that were brought by the state troopers against James Earle, they had no way of anticipating it.

The problem with that is the [Massachusetts] Supreme Judicial Court, at least five years prior to these 1980 complaints, had said in: Common Law versus a Juvenile, unequivocally, that in order to satisfy present constitutional standards, a statute seeking to regulate what we broadly termed defense of speech, will stand only in the words of the case of Chaplinsky versus New Hampshire, that they are drawn too narrow, too limited to

individual basis.

be fighting words; vulgar, profane, offensive or abusive language is not, without more, subject to criminal sanction. That is very plain, very explicit language. And makes it clear that the North Brookfield statute couldn't possibly be constitutional.

THE COURT: How is the officer to know that at the time of the arrest?

MR. PENTLARGE: I don't know.

THE COURT: He follows the by-law. He couldn't interpret the by-law; he could only follow it, and if he didn't, he was in disregard of his duties.

MR. PENTLARGE: Well, that's like saying how could an officer enforce.

THE COURT: He can't interpret what may be declared unconstitutional at a subsequent time. He can only do what is there at the time when it had to be enforced. He was doing his duty. Therefore, I regard that arrest as proper for that reason at that time. All right, gentlemen.

The above colloquy indicates that, by the time of trial, plaintiff was asserting the existence of the incident he now raises notwithstanding its absence from his complaint. Unfortunately, nothing more appears. After the court indicated it regarded "that arrest as proper," plaintiff did not make an offer of proof, outlining the evidence he would have introduced on the matter. An offer of proof could usefully have described the town by-law for violation of which Earle was allegedly charged or arrested by Benoit, the conduct for which Earle was charged or arrested, and the actions Benoit had taken by way of arrest or filing of charges. Details as to what a state court later did to invalidate the ordinance would also have been helpful.

In his appellate brief, Earle attempts to justify the by-law's absence from the record on the ground that the district court took no evidence on the matter after its adverse ruling on the motion in limine. But it is precisely for such a situation, where a court refuses to receive evidence and yet the same is needed to elucidate proponent's claim for admissibility, that the

offer of proof device exists. Under Fed.R. Evid. 103(a)(2),

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> \*     \*     \*     \*     \*     \*
>
> (2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

We know of no way properly to review appellant's current claim of error on this incomplete record. Earle asserts that the purported by-law was unconstitutional on its face. *See Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942). *See also Commonwealth v. A Juvenile*, 368 Mass. 580, 334 N.E.2d 617 (1975). He also contends that trooper Benoit's defense of qualified immunity fails because the law was clearly established when Earle was charged with, or arrested for, a violation of the North Brookfield by-law that the by-law violated the First Amendment. Earle points to the Supreme Court's language in *Illinois v. Krull* that an officer does not have qualified immunity if he relies upon a statute the provisions of which "are such that a reasonable officer should have known that the statute was unconstitutional." 480 U.S. 340, 107 S.Ct. 1160, 1170, 94 L.Ed.2d 364 (1987). *See also Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (applying objective good faith standard of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), in a damages action against a police officer; the question is what a "reasonably well-trained officer" would have known).

But for us to apply the above standards so as to determine whether Earle's proofs might conceivably have made out a legally sustainable claim against Benoit, we need to know (a) the terms of the by-law under which Benoit allegedly issued charges against Earle or arrested him; (b) what

conduct or speech of Earle's was made the subject of the charge; (c) what Benoit allegedly did by way of charging or, possibly, arresting Earle. It behooved Earle's counsel, when confronted with the judge's exclusionary ruling, to make an offer of proof for the purpose of establishing and preserving for the record the material facts which demonstrated the legal validity of his claim. An offer of proof would have enabled the district court to analyze the claim more precisely, possibly leading to a change in its own ruling. More importantly, perhaps, it would have enabled this court to ascertain now whether the evidence in Earle's possession had the potential to establish a legally viable claim which Earle should have been allowed to pursue at trial.

On the present record we can determine neither the possible merit of the claim nor the concomitant harm to Earle from its exclusion. The most obvious gap is the absence of the terms of the challenged town by-law, the alleged unconstitutionality of which lies at the heart of appellant's claim. Earle seeks to make up for this hiatus by citing to and reproducing the terms of an alleged by-law in his appellate brief, but that is not a source from which we can properly receive such information. *Rosen v. Lawson–Hemphill, Inc.*, 549 F.2d 205, 206 (1st Cir.1976).

And even if we were to accept Earle's proffer, we would need additional information in order to assess Earle's claim and Benoit's qualified immunity defense. We must know what Benoit allegedly did, including what speech or conduct was the subject of his charge against Earle. If, for example, the conduct for which Earle was charged or arrested involved "fighting words" or other constitutionally unprotected conduct, the fact the state trooper acted under a town by-law which may have suffered from overbreadth and vagueness might not suffice to establish a section 1983 damages claim against the officer. *Hearn v. Hudson*, 549 F.Supp. 949, 956 (W.D.Va.1982). The strength of the officer's good faith immunity defense might turn on a similar factual issue, *i.e.*, whether the charge or arrest was for constitutionally punishable speech (whatever the defects in the town by-law itself) or was instead for protected speech. A reasonably well-trained officer, acting in good faith, might take action against misconduct which the Constitution does not protect even though the town by-law under which he acted was overbroad. In any case, determining whether by-laws of this type are overbroad or vague, and the consequences of their enforcement in particular instances, cannot be determined by reference to abstract generalities.[12] Determining, even on a threshold basis, what a "reasonably well-trained officer" might have known and done requires a factual context well beyond what is present here.

For these reasons, we cannot rule that the court below committed reversible error by excluding Earle's unknown evidence of unknown events whose basic contours were never described either in the complaint or by means of an offer of proof. With virtually no information as to plaintiff's proposed proofs concerning this incident, we decline to speculate as to the correctness or incorrectness of the lower court's exclusionary ruling. Absent compliance with Rule 103(a)(2)—or absent some other satisfactory basis in the record for ascertaining the threshold facts necessary to assess the admissibility of Earle's evidence—we find no error.[13]

### VII.

Earle contends that the district court erred in dismissing his claim that Benoit

---

12. In this area of the law, "the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed or punished is finely drawn." *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). A narrow construction by a state court can sometimes save an otherwise overbroad enactment. *See Gooding v. Wilson*, 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972). Hence determining if a police officer is acting beyond the paradigm of a "reasonably well-trained officer" when he enforces a particular enactment is a fact-specific matter of some delicacy.

13. We recognize that in cases like this where evidence is excluded because of the court's disagreement with counsel over principles of substantive law, counsel may in some circumstances be excused from making an offer of proof.

unconstitutionally arrested him on September 27, 1980. We uphold this contention.

In his complaint Earle alleged that on September 27, 1980, he went to the Brookfield Police barracks of the Massachusetts State Police to post bail for a friend who had been arrested. While in the lobby of the barracks, Earle alleges that he was arrested by defendant Benoit for trespassing, without any justified reason. It is well established that an arrest without probable cause violates rights protected by the Fourth and Fourteenth Amendments of the federal Constitution. *Dunaway v. New York*, 442 U.S. 200, 206–16, 99 S.Ct. 2248, 2253–59, 60 L.Ed.2d 824 (1979). *See Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Although Earle was initially found guilty after a bench trial in a lower Massachusetts court on the trespassing charge, he was apparently exculpated in a de novo trial which he claimed under the Massachusetts two-tier system. In the de novo trial, the Massachusetts Superior Court reportedly held that there had been no probable cause for Benoit to arrest him at the barracks and granted Earle's motions to suppress the evidence and dismiss the charges.

■ The court below, responding to defendants' motion in limine, declined to allow plaintiff to present evidence in support of his claim that Benoit had illegally arrested him in violation of his rights under the federal Constitution. The court ruled that Earle's original conviction on the trespassing charge, even though later reversed, established that Benoit had probable cause to arrest him. Since Benoit had probable cause there could be no section 1983 action premised on an illegal arrest.

The district court reached its decision on the basis of *Broussard v. Great Atlantic & Pacific Tea Co.*, 324 Mass. 323, 86 N.E. 2d 439 (1949), in which the Massachusetts Supreme Judicial Court held that in an action of tort for malicious prosecution, "a conviction of the accused by a tribunal to which the complaint was made, although reversed on appeal, conclusively establishes the existence of probable cause unless the conviction 'was obtained solely by false testimony of the defendant [charged with malicious prosecution] or is impeached on the grounds of fraud, conspiracy or subordination in its procurement.'" 86 N.E.2d at 440 (quoting *Dunn v. E.E. Gray Co.*, 254 Mass. 202, 202–04, 150 N.E. 166 (1926) (brackets in original)). *Broussard* was recently followed by the federal district court of Massachusetts in deciding a state claim for malicious prosecution. *Ramos v. Gallo*, 596 F.Supp. 833 (D.Mass.1984). But while *Broussard* apparently remains good Massachusetts law in respect to actions of tort for malicious prosecution, we have been shown no Massachusetts authority holding that *Broussard* extends to the different issue of *probable cause to arrest.* It is one thing to treat a criminal conviction—even one that is later reversed—as barring a subsequent cause of action for malicious prosecution against the complaining witness. It is another to treat such a conviction as determinative of whether an arresting officer had probable cause, *at the time he made an arrest,* to have arrested someone. Whether or not an arresting officer had probable cause depends on the facts and circumstances known to police at the time of the arrest. Conviction of the accused at a subsequently held trial may demonstrate the existence, *at that later time,* of adequate evidence of guilt, but it does not necessarily reflect the sufficiency of the police's knowledge at the time of the arrest. In any event, absent Massachusetts case law applying *Broussard* in situations involving charges of illegal arrest, we reject the lower court's premise that under current Massachusetts law, Earle's initial conviction would have preclusive effect on the issue of whether the arresting officer had probable cause to arrest.

We have addressed Massachusetts law because the exclusionary ruling below rest-

---

*See* J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 103[03], at 103–39 (1986). Usually in such cases, however, the facts relevant to the substantive issue will be clear on the record. Our holding here is not that an offer of proof is always required, but simply that where facts essential to assessing appellant's claim are not otherwise available in the record, it is appellant's responsibility, if he wishes to preserve the issue for appeal, to see that these facts are set out either by offer of proof or in some other acceptable manner.

ed on the supposed preclusive effect, under *Broussard*, of Earle's initial state conviction. For reasons just stated, we do not believe that initial conviction—subsequently vacated and, for practical purposes, reversed at a later state trial—had preclusive effect under Massachusetts law. There is, therefore, no need for us to consider further what effect the Massachusetts case law might have in this area if, in fact, *Broussard* stood for the proposition argued.[14] *Compare Migra v. Warren City School District Board of Education,* 465 U.S. 75, 83, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984). *See Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980).

We hold that the district court erred in refusing to proceed with Earle's claim that he was arrested by defendant Benoit without probable cause in violation of the Fourth and Fourteenth Amendments of the federal Constitution. The *Broussard* decision provided no proper basis for dismissing that claim.

*The district court order dismissing plaintiff's Fourth Amendment claim against defendant Benoit for unconstitutional arrest on September 27, 1980, is vacated and remanded for further proceedings not inconsistent herewith. In all other respects the judgment is affirmed.*

### APPENDIX A

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JAMES EARLE,

Plaintiff

v.

ROBERT BENOIT and

JAMES JAWOREK, Defendants

CIVIL ACTION NO. 82–0152–F

SPECIAL INTERROGATORIES

1. (a) Has the plaintiff James Earle proven by a preponderance of the evidence that defendant Robert Benoit violated plaintiff's civil rights on August 7, 1980, by searching plaintiff without having reasonable grounds to believe that plaintiff was armed and presently dangerous, or by searching plaintiff beyond the scope necessary to determine if the plaintiff was armed and presently dangerous?
Yes _____ No ✓

(b) If your answer to question 1(a) is <u>Yes</u>, was defendant Benoit's conduct a proximate cause of plaintiff's damages?
Yes _____ No _____

(c) If your answer to question 1(b) is <u>Yes</u>, is defendant Benoit entitled to qualified immunity on this claim?
Yes _____ No _____

(d) If your answer to question 1(c) is <u>No</u>, what amount of compensatory damages, if any, do you award to the plaintiff against defendant Benoit for this conduct?
_____ (in words)
$ _____ (in figures)

2. (a) Has the plaintiff proven by a preponderance of the evidence that defendant Benoit violated plaintiff's civil rights on August 7, 1980, by arresting plaintiff without probable cause?
Yes _____ No ✓

(b) If your answer to question 2(a) is <u>Yes</u>, was defendant Benoit's conduct a proximate cause of plaintiff's damages?
Yes _____ No _____

(c) If your answer to question 2(b) is <u>Yes</u>, is defendant Benoit entitled to qualified immunity on this claim?
Yes _____ No _____

(d) If your answer to question 2(c) is <u>No</u>, what amount of compensatory damages, if any, do you

---

**14.** We think it at least doubtful whether a state rule such as that in *Broussard* (even if applicable under state law to arrests) would be dispositive as to the constitutionally mandated probable cause standard. We do not, however, reach that question.

award to plaintiff against defendant Benoit for this conduct?
_____ (in words)
$_____ (in figures)

3. (a) Has the plaintiff proven by a preponderance of the evidence that defendant Benoit violated plaintiff's civil rights on August 7, 1980, by using excessive force while arresting plaintiff?
Yes _____ No ✓

(b) If your answer to question 3(a) is Yes, was defendant Benoit's conduct a proximate cause of plaintiff's damages?
Yes _____ No _____

(c) If your answer to question 3(b) is Yes, what amount of compensatory damages, if any, do you award to plaintiff against defendant Benoit for this conduct?
_____ (in words)
$_____(in figures)

4. (a) Has the plaintiff proven by a preponderance of the evidence that defendant James Jaworek violated plaintiff's civil rights on September 6, 1980 by stopping plaintiff's van for no legitimate reason, by searching plaintiff's van without probable cause, or by making an over-broad search of the van?
Yes _____ No ✓

(b) If your answer to question 4(a) is Yes, was defendant Jaworek's conduct a proximate cause of plaintiff's damages?
Yes _____ No _____

(c) If your answer to question 4(b) is Yes, is defendant Jaworek entitled to qualified immunity?
Yes ✓ No _____

(d) If your answer to question 4(c) is No, what amount of compensatory damages, if any, do you award to plaintiff against defendant Jaworek?
_____ (in words)
$_____(in figures)

5. If your answer to either questions 1(c) or 2(c) is No, or your answer to question 3(b) Yes, then do you award punitive damages against defendant Benoit?
Yes _____ No _____

6. If your answer to question 5 is Yes, then what amount of punitive damages do you award to the plaintiff against defendant Benoit?
_____ (in words)
$_____(in figures)
/s/ Patricia M. Dawling
Foreperson
Date 1–16–87