**C.D. DiGIAMBATTISTA, Plaintiff,**

v.

**Michael J. DOHERTY, James F. Henry, Individually and in their Official Capacity; The City of Everett; Edward G. Connolly; George B. Stewart; Michael A. Orlandella; Ralph A. Orlandella; Anne P. Orlandella; Richard H. Liebman; Pauline M. Johnson and Carl DeJohn, Defendants.**

Civ. A. No. 88–0795–RCL.

United States District Court,
D. Massachusetts.

Sept. 1, 1995.

C.D. DiGiambattista, Everett, MA, pro se.

Franklin H. Levy, Abrams, Roberts, Klickstein & Levy, Boston, MA, for defendant Everett Police Officer, Employees and Police Officers, Edward G. Connolly, George B. Stewart.

Franklin H. Levy, Abrams, Roberts, Klickstein & Levy, Boston, MA, Peter C. Phillips, International Brotherhood of Police Officers, Quincy, MA, Joseph G. Donnellan, Counsel International Brotherhood of Police Officers, Quincy, MA, for defendants Michael J. Doherty, James Henry.

Antonio Abbene, Revere, MA, Franklin H. Levy, Abrams, Roberts, Klickstein & Levy, Boston, MA, for defendants Michael A. Orlandella, Ralph A. Orlandella.

Antonio Abbene, Jr., Revere, MA, for defendant Anne P. Orlandella.

Arthur E. Nicholson, Quincy, MA, for defendant Richard H. Liebman.

Richard H. Liebman, Boston, MA, for defendants Pauline M. Johnson, Carl DeJohn.

## Opinion

LINDSAY, District Judge

The plaintiff, C.D. DiGiambattista, has sued the City of Everett, several Everett police officers, and several of his own family members, in connection with an arrest of him in 1985. Specifically, he filed this suit against Michael J. Doherty and James F.

Henry, individually and in their official capacity as police officers of the City of Everett; Edward G. Connolly, Former Mayor of the City of Everett; George B. Stewart, Chief of Police of the City of Everett; Michael A. Orlandella; Ralph A. Orlandella; Anne P. Orlandella; Richard H. Liebman; Pauline M. Johnson and Carl DeJohn for, among other things, violations of rights secured to him under the First, Fourth, Fifth, Eighth, Thirteenth and Fourteenth amendments to the Constitution of the United States and for "malicious use of process" and malicious prosecution. He purported to bring the federal claims pursuant to 42 U.S.C. §§ 1981, 1982, 1983 and 1985(3) and the state claims pursuant to the court's ancillary jurisdiction. On November 2, 1993, Judge Mazzone of this district dismissed all counts against all defendants, except for those counts against Henry and Doherty, who had arrested the plaintiff. The judge appears to have allowed the case to go forward against Henry and Doherty because they had not filed a motion to dismiss. Count I, against Doherty, alleges deprivation of the plaintiff's rights under the First, Fourth, Fifth and Eighth amendments to the Constitution, as incorporated into the Fourteenth amendment. Count II alleges that Henry conspired with Doherty to deprive the plaintiff of these same rights. Count V alleges that Doherty and Henry committed the state law tort of malicious prosecution and what the plaintiff calls "malicious use of process."

Doherty and Henry have moved for summary judgment. The plaintiff has moved to have this court reconsider the ruling of Judge Mazzone and to reinstate the claims Judge Mazzone dismissed.

After reviewing the papers submitted by the parties, and after a hearing on the motion, the court concludes that summary judgment for the defendants is appropriate. The court also rules that reinstatement of the claims dismissed by Judge Mazzone is unwarranted.

## I. Summary Judgment Standard

Summary judgment is called for when "based upon the pleadings, affidavits, and depositions, 'there is no genuine issue as to any material fact,' and where 'the moving party is entitled to judgment as a matter of law.'" *FDIC v. Anchor Properties*, 13 F.3d 27, 30 (1st Cir.1994), *quoting* Fed.R.Civ.P. 56(c) *and citing Gaskell v. Harvard Co–Op Soc'y*, 3 F.3d 495, 497 (1st Cir.1993). The moving party has the burden to establish the lack of a genuine, material factual issue. *Snow v. Harnischfeger Corp.*, 12 F.3d 1154, 1157 (1st Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994), *citing Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir.1986).

After the moving party offers evidence of the absence of a genuine issue, the nonmoving party bears the burden of placing at least one material fact in dispute. *Anchor Properties*, 13 F.3d at 30. The plaintiff "may not rest upon mere allegation or denials of [his or her] pleading, but must set forth specific facts showing there is a genuine issue for trial." *Snow*, 12 F.3d at 1157, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Anchor Properties*, 13 F.3d at 30, *quoting Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). "Brash conjecture, coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment." *Anchor Properties*, 13 F.3d at 31, *quoting Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993).

## II. Facts.

The plaintiff claims that there exist genuine issues of material fact.

### A. Doherty's and Henry's Affidavits

#### 1. Doherty

Michael Doherty states that he is a police officer employed by the City of Everett. He

states that on the evening of May 8, 1985, he was on duty and assigned to patrol with James Henry. According to Doherty, the two officers responded to a call concerning a fallen tree on or near Waverly Street in Everett. Upon their arrival, Doherty noticed that a crowd of ten to twelve civilians had gathered, and that traffic was backed up on the street. Doherty states that he arrested the plaintiff for disorderly conduct. He explains his reasons for deciding to make the arrest by saying:

> My decision to arrest the Plaintiff on May 8, 1985 was based solely on my observations of the Plaintiff as he, in my presence, used profane language directed at another person in violation of the disorderly conduct ordinance of the City of Everett ... It is my memory that the Plaintiff spoke in a rude and disorderly manner toward his sister, Anne P. Orlandella, through the use of the words, Come on you bitch and by yelling "You killed our mother, you bitch." The Plaintiff repeatedly used these other [sic] obscene words when addressing the Orlandellas. I warned him on several occasions that his continued use of this language would result in his being arrested. Despite my numerous warnings, the Plaintiff continued his use of the obscenities and I placed him under arrest. A crowd of approximately 10–12 peopled [sic] had gathered and did witness the commotion surrounding the Plaintiff's arrest.

Doherty states that he did not know the plaintiff prior to May 8, 1985.

### 2. *Henry*

James Henry, in his affidavit, similarly states that he is an Everett police officer, and that he was on duty with Doherty on the evening of May 8, 1985, when they responded to the call at Waverly Street. He states that he observed the following:

> (a) While I was sitting in an Everett patrol car taking a report from Ralph, Ann and Michael Orlandella the Plaintiff came up to the patrol car and pushed Michael Orlandella out of the way while calling him a 'fucking queer.' The Plaintiff then demanded to file a complaint against the Orlandellas. I got out of the patrol car and ordered him to move to the sidewalk.

I informed him that I would take his report after I finished with the Orlandellas.

> (b) I then heard the Plaintiff shout from the sidewalk area toward my patrol car, "You killed our mother, you bitch." At that point, I ordered the Plaintiff to be quiet and to move further down the sidewalk away from my patrol car and the Orlandellas.

> (c) I observed Officer Doherty approach the Plaintiff. As he did so, I exited the patrol car. At that point in time I observed Officer Michael Doherty place the Plaintiff under arrest.

> (d) After Officer Doherty placed the Plaintiff in the back of the patrol car the Plaintiff continued to scream obscenities. The Plaintiff attempted to flee from the patrol car. Although I cautioned the Plaintiff to remain still, as his constant thrashing about was conduct that would cause handcuffs to tighten, the Plaintiff never complained to me that the handcuffs were causing him any pain.

Henry states that he had previously testified to the above at the plaintiff's criminal trial. He also says that before May 8, 1985, he had never heard of the plaintiff.

### B. *The Plaintiff*

The plaintiff has submitted an "Affidavit of Contested Fact."

He states that he "was arrested for an offense of speech under Everett City Ordinance c. 11, Section 14." He asserts that "as a disorderly person tried under the said city ordinance [sic], [he] was tried on the evidence that he had attempted three times to destroy police cruiser 142 belonging to the City of Everett, of which charge he was acquitted."

The plaintiff denies that the "basis of [his] arrest in May 1985 was [his] use on two occasions of the word 'bitch' in a public place ..." In fact, he says, he was put "under effective arrest" by Doherty as soon as Doherty arrived at cruiser 142, and before he uttered the word "bitch." The "effective arrest" occurred, he claims, when Henry ordered him to stand on a designated corner of

the sidewalk, and Doherty then left the center of the intersection to stand next to him. The plaintiff asserts that he "was arrested by Doherty and Henry on unverified and still undisclosed information given to the police officers by the informants Ralph A. Orlandella, Anne P. Orlandella, and Michael Anthony Ralph Orlandella."[1]

The plaintiff also claims that Doherty deliberately provoked the plaintiff in order to create a pretext to arrest him, when in fact the plaintiff was already under arrest by virtue of having been detained and guarded. The provocation, he claims, was Doherty's warrantless seizure of the plaintiff's car, intended to provoke a reaction that would appear to justify an arrest. The plaintiff does not explain, however, how any incident with the car was, or could have been, a pretext for his arrest, because he does not say what his reaction to the car incident was, or what reaction the officers might have expected of him.

### C. Are there genuine issues of fact?

The court concludes that there are no genuine issues of material fact regarding the circumstances and reasons for the plaintiff's arrest on May 8, 1985.

In an effort to contradict the defendants' assertion that the arrest was based on the use of certain language and conduct, the plaintiff can only point to unsupported hearsay statements and speculation apparently gleaned from his attorney. The plaintiff, however, may not rely on "unverified and still undisclosed information"—in a word hearsay—to create a dispute of fact. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). He must offer evidence that would be admissible at trial, and such evidence is lacking here. The plaintiff has thus failed to show that he was arrested for anything other than the reasons stated by Doherty and Henry.

Additionally, the plaintiff has failed to show that he was "under effective arrest" before he used the word "bitch." "In evaluating whether a suspect was in custody ..., [a court must] look to see, using objective standards, whether there was a manifestation of a significant deprivation of or restraint on the suspect's freedom of movement ..." *U.S. v. Lanni*, 951 F.2d 440, 442 (1st Cir.1991). At the hearing on this motion, the plaintiff admitted that no one had told him that he was under arrest. He stated only that Doherty's "attitude," when standing next to him, indicated to him that he was under arrest. The plaintiff did not explain what it was about Doherty's attitude that made him think he was under arrest.

The court concludes, however, that the plaintiff has failed to show that he was under arrest when he was asked to stand on the sidewalk, and when Officer Doherty stood next to him. No objective manifestations of an arrest were present. The plaintiff was not handcuffed or physically restrained in any way. As noted earlier, he was not told that he was under arrest. Nor was there anything else, objectively viewed, that constituted an arrest. The plaintiff may have thought that he was under arrest, but he was not in fact under arrest, and it was not reasonable for him to think that he was.

Finally, the plaintiff has failed to offer more than speculation in his assertion that Officer Doherty arrested the plaintiff on the basis of a pretext arising from the alleged seizure of his car.

In the end, the plaintiff does not deny any of the conduct attributed to him in the affidavits of Doherty and Henry. The court concludes that the plaintiff has placed no material fact concerning the reasons for his arrest in genuine dispute.

### III. Law.

#### A. The Ordinance

Section 4 of the Everett Ordinances provides:

> this information, and not the officers' stated reasons, was the true basis for his arrest. The plaintiff, however, does not state what the "inaccurate" and "unverified" information was that, according to him, formed the basis for his arrest.

1. The plaintiff apparently claims that Lt. Charles Savage of the Everett police told the plaintiff's attorney that the three Orlandellas had given Doherty and Henry information which was not accurate, and which Doherty and Henry did not verify. The plaintiff seems to be suggesting that

No person shall behave in a rude or disorderly manner, or use any indecent, profane or insulting language, in any public way, park, common or other public place in the city, or near any dwelling house or public building therein.

A note in the ordinances referring to section 4 states, "For the law of the Commonwealth in connection with this section, see G.L. c. 272, sections 36–38, 40–43, 53 and 54."

### B. The First Amendment and the Overbreadth Doctrine

The plaintiff claims that the Everett ordinance was overbroad, and that his arrest under it was, therefore, constitutionally infirm.

The Supreme Court has developed the "overbreadth doctrine" to analyze statutes or ordinances which arguably infringe on protected speech. A crucial characteristic of the overbreadth doctrine is that the court does not conduct an "as-applied" analysis to a law challenged in a criminal proceeding as overly broad. The overbreadth doctrine is a departure from the "traditional rule ... that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982). The doctrine is premised on a fear of the "chilling effect" of an overly broad statute on the free exercise of speech of those individuals not before the court. "[P]ersons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression." *Ferber*, 458 U.S. at 768, 102 S.Ct. at 3361, *quoting Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 834–35, 63 L.Ed.2d 73 (1980). "It is for this reason that we have allowed persons to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *Ferber*, 458 U.S. at 769, 102 S.Ct. at 3361.

The Supreme Court has cautioned that the overbreadth doctrine is "strong medicine" which should be used with "hesitation" and only "as a last resort." *Ferber*, 458 U.S. at 769, 102 S.Ct. at 3361. The Court requires that the overbreadth be "substantial" before a statute is invalidated on its face. *Id.* Specifically, the Court has stated:

This Court has ... repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications to which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct....'

*Id.* at 770, n. 25, 102 S.Ct. at 3362, *quoting Parker v. Levy*, 417 U.S. 733, 760, 94 S.Ct. 2547, 2564–65, 41 L.Ed.2d 439 (1974).

In *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the Supreme Court invalidated a Georgia "breach of the peace" statute. That statute provided: "Any person who shall, without provocation, use to or of another, and in his presence ... opprobrious words or abusive language, tending to cause a breach of the peace .. shall be guilty of a misdemeanor." *Id.* at 518, 92 S.Ct. at 1103, *quoting* Georgia Code Ann. § 26–6303. In evaluating the statute's constitutionality, the Court took into account its construction by the Georgia Supreme Court. The appellant, the warden in the Georgia prison where the appellee was confined for violation of the statute, contended that the statute had been narrowly drawn to apply only to fighting words. The Supreme Court disagreed, however, concluding that the statute had not been narrowly construed to apply only to "words that 'have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed.'" *Gooding*, 405 U.S. at 524, 92 S.Ct. at 1107, *quoting Chaplinsky v. New Hampshire*, 315 U.S. 568, 573, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942).

The Court reviewed the principles underlying the overbreadth doctrine:

It matters not that the words appellee used might have been constitutionally prohibited under a narrowly and precisely drawn statute. At least when statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution' ... the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' .... This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression.

*Gooding,* 405 U.S. at 520–21, 92 S.Ct. at 1105 (citations omitted). Under these principles, the Supreme Court concluded that the Georgia statute was overly broad.

In *Commonwealth v. A Juvenile,* 368 Mass. 580, 334 N.E.2d 617 (1975), the Supreme Judicial Court of Massachusetts ruled unconstitutionally overbroad one of the Massachusetts statutes on which the ordinance at issue here is based. The statute, M.G.L. c. 272, § 53, provided:

Common night walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly act or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, prostitutes, disturbers of the peace, keepers of noisy and disorderly houses and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment.

The Court explained that it had earlier construed the statute in *Alegata v. Commonwealth,* 353 Mass. 287, 231 N.E.2d 201 (1967), engrafting onto its provisions the Model Penal Code's definition of disorderly conduct:

A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor ...

Relying on the First Amendment overbreadth doctrine as articulated by the Supreme Court, the Supreme Judicial Court struck down the statute as construed in the *Alegata* case, insofar as it impinged on the exercise of First Amendment rights. *A Juvenile,* 334 N.E.2d at 628. According to the court, "[v]ulgar, profane, offensive or abusive speech is not, without more, subject to criminal sanction for 'the First and Fourteenth Amendments must be taken to disable the State from punishing public utterance of.... unseemly expletive(s) in order to maintain what they [sic] regard as a suitable level of discourse within the body politic.'" *Commonwealth v. A Juvenile,* 334 N.E.2d at 623–24, *quoting Cohen v. California,* 403 U.S. 15, 23, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971). "[O]ne man's vulgarity is another's lyric." *A Juvenile,* 334 N.E.2d at 624, *quoting Cohen,* 403 U.S. at 25, 91 S.Ct. at 1788.

The Supreme Judicial Court ruled that the statute encompassed more than just "fighting words" and trenched on protected speech. *A Juvenile,* 334 N.E.2d at 625–27.

C. *Application of Overbreadth Doctrine to this Case*

■ From the above cases, it is not difficult to conclude that DiGiambattista, in his criminal case, could have challenged the ordinance's unconstitutionality, and if he had done so, the ordinance likely would have been struck down. The ordinance prohibits people from acting in a "rude or disorderly manner, or [using] any indecent, profane or insulting language." It explicitly relies on the Massachusetts statute which the Supreme Judicial Court struck down a decade before the arrest took place. There is no

attempt to limit the ordinance's application to fighting words. Indeed, there is not even a reference to the person to whom the prohibited language is addressed. In a criminal case, DiGiambattista would have had standing to raise the ordinance's constitutionality under the overbreadth doctrine, and his challenge of the ordinance would likely have succeeded.

But this is not a criminal case. It is a section 1983 action. And in a section 1983 action, a plaintiff cannot necessarily benefit from an ordinance's unconstitutionality, at least if the plaintiff's speech was itself otherwise unprotected. In other words, when it comes to a damages action under section 1983, the court must employ an "as-applied" analysis. Such is the apparent lesson of *Earle v. Benoit*, 850 F.2d 836, 846–48 (1st Cir.1988).

In *Earle*, the plaintiff, in his brief to the First Circuit, claimed that "his arrest by Trooper Benoit, pursuant to a town by-law prohibiting indecent or profane language, violated his constitutionally protected right to freedom of speech." *Id.* at 846. Although he quoted the by-law in his brief, the plaintiff never made an offer of proof at the trial level. The First Circuit ultimately concluded that the absence of the offer of proof was fatal to the plaintiff's effort to reverse the trial judge's decision to preclude the plaintiff from going forward with his First Amendment claim. Along the way, the First Circuit made some important remarks about overbreadth claims in the context of a section 1983 action:

> [E]ven if we were to accept Earle's proffer, we would need additional information in order to assess Earle's claim and Benoit's qualified immunity defense. We must know what Benoit allegedly did, including what speech or conduct was the subject of his charge against Earle. If, for example, the conduct for which Earle was charged or arrested involved 'fighting words' or other constitutionally unprotected conduct,

the fact the state trooper acted under a town by-law which may have suffered from overbreadth and vagueness might not suffice to establish a section 1983 damages claim against the officer. *Hearn v. Hudson*, 549 F.Supp. 949, 956 (W.D.Va.1982). The strength of the officer's good faith immunity defense might turn on a similar factual issue, *i.e.* whether the charge or arrest was for constitutionally punishable speech (whatever the defects in the town by-law itself) or was instead for protected speech. A reasonably well-trained officer, acting in good faith, might take action against misconduct which the Constitution does not protect even though the town by-law under which he acted was overbroad. In any case, determining whether by-laws of this type are overbroad or vague, and the consequences of their enforcement in particular instances, cannot be determined by reference to abstract generalities.

*Earle*, 850 F.2d at 848.

In a footnote, the First Circuit added:

> In this area of the law, 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed or punished is finely drawn' ... A narrow construction by a state court can sometimes save an otherwise overbroad enactment ... Hence determining if a police officer is acting beyond the paradigm of a 'reasonably well-trained officer' when he enforces a particular enactment is a fact-specific matter of some delicacy.

*Id.* at 848 n. 12.

█ Although done in dictum and hesitant phrasing, ("might not suffice"; "might turn"), the First Circuit appears to have adopted two distinct, but related, barriers to recovery in a section 1983 overbreadth suit. First, as a substantive matter, if the plaintiff's speech was itself unprotected, then the plaintiff's constitutional rights have not been violated, and he may not recover damages under section 1983.[2] This was the holding of *Hearn v.*

---

2. The instant case presents a conundrum with which the First Circuit was not directly faced in *Earle*. Under the logic of the dictum in *Earle*, a police officer can arrest someone under a flagrantly unconstitutional statute, and if the individual had engaged in unprotected speech, no

constitutional rights would be deemed to have been violated. But if this same person is prosecuted, the statute would be declared unconstitutional. One might say that the person should not have been arrested in the first place under the flagrantly unconstitutional statute. But for the

*Hudson,* 549 F.Supp. 949 (W.D.Va.1982), on which the First Circuit relies. Said the court in *Hearn:*

> In addressing the compensation issue … we must focus on the actual injury to the plaintiff.… That requires in the First Amendment area an inquiry into whether the activity of the plaintiff is susceptible of First Amendment protection; for if that activity was not protected or privileged, the plaintiff obviously cannot be deemed injured in his First Amendment interests when government forbids that activity.… Although overbreadth analysis may very well have afforded the plaintiff a good defense in criminal proceedings [footnote omitted], it is obvious that arresting him and charging him with violating the ordinance infringed none of his own personal First Amendment rights. He therefore can assert no right to compensation under the First Amendment under the circumstances presented here.

*Hearn,* 549 F.Supp. at 955–56. *See Noelker v. City of Kansas City,* 802 F.Supp. 268, 270 (W.D.Mo.1992) (adopting *Hearn* analysis).

■ In addition to the substantive view that the actual conduct of a defendant must be evaluated in a Section 1983 overbreadth challenge, the First Circuit also suggests that a police officer may be entitled to qualified immunity if he takes action against unprotected conduct, even pursuant to an overbroad statute. *Earle,* 850 F.2d at 848.

The court concludes that, based on the First Circuit's statements in the *Earle* case, the plaintiff may not prevail in his overbreadth challenge to the ordinance. Thus, in order for the plaintiff to prevail on his constitutional challenge to the defendants' conduct, he must show that the speech for which he was arrested was not unprotected "fighting words."

### D. *Fighting Words.*

#### 1. *The Fighting Words Doctrine*

The "fighting words" doctrine has its origins in the case of *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). In that case, a Jehovah's Witness was arrested, prosecuted and convicted under a New Hampshire statute for stating: "You are a God damned racketeer" and "a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists." The Supreme Court upheld the conviction, stating:

> [I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—*those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.* It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Id.* at 571–72, 62 S.Ct. at 769 (emphasis added).

The Supreme Court, since the *Chaplinsky* case, has narrowed the definition of "fighting words," emphasizing the context of the utterances, as opposed to simply listing certain words as beyond the First Amendment's scope. *See* Note, *The Fighting Words Doctrine,* 93 Colum.L.Rev. 1527, 1528 (1993). In *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court reversed the conviction of the defendant under

---

arrest under an unconstitutional statute, the person would have had his or her liberty interests preserved intact. If the police should not have arrested a person under a clearly unconstitutional statute, then perhaps some right of the person has been violated. In addition, one may ask whether an officer may be considered to have acted in "good faith" if it is clearly established

that the ordinance under which he or she was acting was unconstitutional. The parties have not briefed or argued these questions, and the court concludes that the language in *Earle* governs the result in this case. The First Circuit, if faced with a well-briefed argument on these issues, might have occasion to revisit them.

a California statute for wearing a jacket emblazoned with the words "Fuck the Draft." In concluding that the slogan did not constitute unprotected "fighting words," the Court noted that:

> States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke a violent reaction. [*Citing Chaplinsky*] While the four-letter word displayed by Cohen in relation to the draft is not uncommonly employed in a personally provocative fashion, in this instance it was clearly not 'directed to the person of the hearer.' *Cantwell v. Connecticut,* 310 U.S. 296, 309 [60 S.Ct. 900, 906, 84 L.Ed. 1213] (1940). No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult. Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction. *Cf. Feiner v. New York,* 340 U.S. 315 [71 S.Ct. 303, 95 L.Ed. 295] (1951); *Terminiello v. Chicago,* 337 U.S. 1 [69 S.Ct. 894, 93 L.Ed. 1131] (1949). There is, as noted above, no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result.

*Id.* at 20, 91 S.Ct. at 1785–86.

From *Cohen,* one sees that the Court has retreated from that part of the *Chaplinsky* definition which holds that words which "by their very utterance inflict injury" are unprotected. *See* Note, 93 Colum.L.Rev. at 1539–40.

In *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the Supreme Court further narrowed the fighting words doctrine. In *Gooding,* discussed above in the overbreadth section of this opinion, the Court, in its rejection of the state court's construction of the "breach of the peace" statute, stated that the Georgia court applied the statute to "utterances where there was no likelihood that the person addressed would make an immediate violent response." *Id.* at 528, 92 S.Ct. at 1109.

█ Thus, in order for words to be considered fighting words, one must look at the circumstances in which they were uttered, not solely at the words themselves. *See* Note, 93 Colum.L.Rev. at 1542. *See also Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974) (Powell, concurring) ("[W]ords may or may not be 'fighting words,' depending upon the circumstances of their utterance."); *Hammond v. Adkisson,* 536 F.2d 237, 239 (8th Cir.1976) (To withstand First Amendment scrutiny, there must be "a determination that the words were used 'under the circumstances' that they were likely to arouse to immediate and violent anger the person to whom the words were addressed.")

An Eleventh Circuit case provides a useful illustration of the context-based analysis now used to evaluate "fighting words." In *Lamar v. Banks,* 684 F.2d 714 (11th Cir.1982), a cabdriver said the following to a female college student passenger, in an apparent and coarse attempt to seduce her: "I bet your honey doesn't have the nine and one-half inch penis I have." The defendant was convicted under the Georgia "fighting words" statute, which had been revised after the Supreme Court's *Gooding* opinion. The Eleventh Circuit rejected the defendant's argument that one could not be convicted for using "fighting words" unless the hearer is actually aroused to violence, or unless the speaker intended that result. Said the court:

> First of all, it makes no sense for the defendant's criminality to depend on the actual reaction of the hearer of the accused words. Under the rule proposed, if the young woman had struck Lamar, or struck at him, he would be validly convicted, but because she had the prudence to restrain herself, his words would be constitutionally protected. It is the *tendency* or *likelihood* of the words to provoke violent reaction that is the touchstone of the *Chaplinsky* test, not whether in a given case violence was desired by the speaker or actually occurred. . . .

*Id.* at 718–19 (emphasis added).

The Eleventh Circuit turned to the question of whether the statute was invalid as

applied to what the defendant said to his passenger. The court stated that the words were

> not inflammatory *per se,* without regard to the circumstances in which they were uttered ... The circumstances surrounding the words can be crucial, for only against the background of surrounding events can a judgment be made whether these words had 'a direct tendency to cause acts of violence' by petitioner's passenger. '[C]onstitutional enforcement of even facially valid laws applied to 'fighting words' now appears to depend as much on the factual circumstances surrounding a word's utterance as on the character of the word uttered. Tribe, *American Constitutional Law* 618 (1978) ...

*Id.* at 719. The Court stated that the tone of the conversation might have been jocular, not hostile. Because there was no factual record as to the circumstances in which the remark was made, the Eleventh Circuit remanded to the trial court for factfinding.

2. *The Fighting Words Doctrine as Applied to This Case.*

 The court, taking all of the circumstances of the plaintiff's arrest into account, concludes that the plaintiff's speech constituted unprotected fighting words.

A crowd had gathered at the site of the incident involving the fallen tree, and traffic was blocked. The plaintiff *shouted* "You killed our mother, you bitch" to his sister. He also said "Come on you bitch." Significantly, the plaintiff also used physical force, pushing Michael Orlandella away from the patrol car. At the same time, he called Michael Orlandella a "fucking queer." The plaintiff's repeated use of the word "bitch," his accusation of matricide directed to his sister, his use of the phrase "fucking queer," his pushing of Michael Orlandella, and his raised voice all tend to show that his conduct, under the circumstances, had the tendency to provoke a physical altercation. His words were likely to arouse an immediate and violent response from those to whom they were directed, even if the words did not in fact have that effect. The plaintiff's speech was not entitled to constitutional protection.

Summary judgment, then, must be granted to the defendants on the plaintiff's First Amendment claim. All of the plaintiff's remaining constitutional and tort claims depend on the validity of his First Amendment claim. Because the First Amendment claimed has been decided against the plaintiff, his other claims must fail also.

Furthermore, the court is satisfied that Judge Mazzone ably dealt with the plaintiff's claims against the other defendants in this action, and the court therefore will not reinstate any of those claims.

Summary judgment for the defendants is granted. Judgment shall enter for the defendants.

So ordered.