USCA1 Opinion

 

United States Court of Appeals
For the First Circuit
 No. 96-2057

 JOHN M. KELLEY,

 Plaintiff, Appellee,

 v.

 AIRBORNE FREIGHT CORPORATION d/b/a AIRBORNE EXPRESS,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. W. Arthur Garrity, Jr., Senior U.S. District Judge]

Before

 Torruella, Circuit Judge,
Bownes, Senior Circuit Judge,
and Stahl, Circuit Judge.

 James W. Nagle, with whom Wilfred J. Benoit, Jr., Anthony M. Feeherry and Goodwin, Procter & Hoar LLP were on brief for appellant.
 Stephen S. Ostrach and Cynthia L. Amara, New England Legal Foundation, on brief for Associated Industries of Massachusetts, amicus curiae.
 David G. Hanrahan, with whom Ross D. Ginsberg and Gilman, McLaughlin & Hanrahan, LLP were on brief for appellee.

April 7, 1998

 
 
 STAHL, Circuit Judge. Defendant/appellant Airborne
Freight Corporation ("Airborne") appeals from a jury verdict in
favor of plaintiff/appellee John Michael Kelley ("Kelley"). After
a ten-day trial, a jury found that Airborne had wilfully
discriminated against Kelley on the basis of his age in violation
of the Age Discrimination in Employment Act, 29 U.S.C. 621 et
seq. ("ADEA") and knowingly violated its state law counterpart,
Mass. Gen. Laws ch. 151B ("ch. 151B"). The district court
accordingly entered judgment for Kelley in the amount of
$1,244,152.24 on the ADEA claim, $3,136,858.29 on the ch. 151B
claim and awarded attorney fees of $190,000. Airborne seeks a new
trial, contending that (1) various evidentiary rulings affected the
verdict and (2) the jury instructions were incomplete and
misleading. In addition, Airborne claims that the district court
improperly calculated the damages. We disagree and affirm. 
 I.
 Background
 On appeal we examine the facts, consistent with record
support, in the light most favorable to the verdict-winner. SeeCumpiano v. Banco Santander P.R., 902 F.2d 148, 151 (1st Cir.
1990). 
 Airborne delivers time-sensitive packages. In 1974, at
age twenty-eight, Kelley quit college to join Airborne as a
District Manager in Tucson, Arizona. Kelley rose through the
ranks, progressing through a series of jobs with increasing
responsibility. During the mid-1980s, the Northeast Region, which
consists of the New England states and most of New York, was beset
by operational problems that were undermining sales in the Boston
area. Airborne asked Kelley to transfer from Miami to Boston to
improve the company's operations in the region. In July 1987, at
age forty-one, Kelley was promoted to Regional Field Services
Manager ("RFSM") for the Northeast Region. 
 Airborne is divided into two divisions: sales and field
services. The sales division sells Airborne's services and
maintains active client accounts. The field services division,
also referred to as "operations," is responsible for ensuring the
timely delivery of parcels. As RFSM, Kelley was in charge of the
operations side of the business for the entire Northeast Region. 
 President and Chief Operating Officer Robert Brazier was
in charge of both divisions nationally. Executive Vice President
Raymond T. Van Bruwaene, who reported to Brazier, managed three
Area Vice Presidents, including Kelley's supervisor, William
Simpson. Kelley was one of five RFSMs working under Simpson. 
Regional Sales Manager James Guiod, was in charge of the sales
division in the Northeast Region. Guiod and Kelley were at the
same managerial level and essentially ran the region together with
divided responsibility. Richard Goodwin directed Airborne's human
resources division. 
 Airborne performs annual reviews of its managers and
collects various data to assess their performance. During Kelley's
initial tenure from mid-1987 to mid-1990, the reviews he received
from Simpson were mixed. Although the quality of Airborne's
service in the region improved, the region demonstrated some
continuing problems in meeting profit goals. 
 In a review conducted in June 1990, Simpson was critical
of Kelley's management skills. Betsy Tate, a lower-level manager
in Rochester, New York, had complained to Simpson that Kelley was
sexually harassing her. Simpson confronted Kelley concerning
Tate's complaints and issued him a verbal reprimand. In a written
review, Simpson noted that the region had failed certain "quality-
of-service" audits, that Kelley at times displayed a sexist
attitude, and that he failed to follow company policy on sexual
harassment. Simpson placed Kelley on probation and informed him
that, if improvements were not made, he would be discharged at the
end of the year, but if improvements were made, Simpson would try
to have the incident removed from Kelley's record.
 Despite these management problems, Kelley's region
enjoyed some notable successes. In January 1988, Brazier
instituted an incentive program called the "Top Gun" Contest, which
awarded $10,000 to the pair of Sales Managers and RFSMs who had the
greatest volume increase in domestic and international outbound
express shipments and revenue each quarter. Between 1988 and 1991,
Guiod and Kelley won the Top Gun award four times, more than the
managers in any other region, prompting Brazier to commend them in
December of 1991 for "being better at selling and servicing than
any of [their] peers." Each letter spoke of Kelley and Guiod in
glowing terms.
 Following the June 1990 review, Kelley apparently made
the improvements Simpson requested. In his evaluation covering the
period from October 1990 to October 1991, Simpson rated Kelley as
"Superior to Outstanding" in each performance category: service,
productivity, cost control, net profit, progress toward
improvement, problem solving, leadership/management skills,
knowledge and technical competence, and communication skills. 
 In late September 1992, Simpson received several
complaints about local service failures within Boston. For reasons
that remain less than precisely clear, Airborne had developed a
practice of sending all packages originating in Boston--including
those destined for Boston-area delivery--on airplanes to Ohio,
where the packages destined for local delivery were sorted and then
routed back to Boston. Despite this circuitous delivery route,
local packages were still delivered on-time the next day unless the
airplane suffered a mechanical failure or there was a weather-
induced delay which made the packages late on arrival. These
mechanical failures occurred on a number of occasions, which
understandably prompted complaints from three Boston customers
(Thomas Cook, Bank of Boston, and Teradyne) because they saw no
need to send local packages to Ohio for sorting. Simpson verbally
directed Kelley to set up a local "sort" process to obviate the need
to send local packages on this seemingly unnecessary round-trip. 
Although service failures were a consistent occurrence in the
delivery business, mistakes like the sort problem caused Airborne
to lose customers, straining the relationship between Kelley and
Guiod. 
 During this time, Simpson complained about the inept
performance of a manager under Kelley's supervision, Bob Cox, who
was also Kelley's brother-in-law. Cox managed the region's North
Shore Station, a station beset with operational problems. The most
notorious gaffe involved an incident in which a driver from Cox's
station failed to deliver over one hundred parcels for Miles Agfa,
a new multi-million dollar national account, leaving the parcels on
a truck parked on Airborne's lot for an entire weekend. Company
policy required supervisors to accompany drivers when first
servicing large new accounts, but Cox failed to do so. As required
by the company's progressive discipline policy, Kelley gave Cox
time to improve his performance but eventually fired him in
February 1993. 
 In the summer of 1992, shortly after having suffered a
minor stroke, Kelley attended a meeting with Simpson, Goodwin, Van
Bruwaene, and other RFSMs from Simpson's area regarding a planned
reduction in force ("RIF"). Goodwin, who managed the Human
Resources Division, informed those present that age was one of the
relevant characteristics in deciding whom to fire. Simpson said,
in substance, that the RIF would "be an excellent opportunity to
get rid of some of the older mediocre managers" in Area 1. 
 That summer, Airborne terminated thirty-four employees as
part of the RIF, including the oldest manager in Kelley's region,
who was in his mid- to late forties. 
 In 1992, a price war broke out between Airborne and
Federal Express, placing considerable pressure on managers to meet
customer expectations. During this time, the company regularly
performed quality-of-service audits to measure the efficiency of
the operations within a region. In July 1992, Kelley's region,
which Airborne admitted was one of the more difficult regions in
the country to manage, was the only region under Simpson's control
that met Airborne's goal of delivering ninety-five percent of the
packages before noon. In August 1992, Simpson informed the RFSMs
that Kelley's region had passed all quality-of-service audits and
congratulated him for this accomplishment. In October 1992,
Simpson sent an E-mail message to his subordinates recognizing
Kelley's Northeast Region for having the best average score of any
region in the company on quality of service audits conducted during
the year. In November 1992, Simpson again congratulated Kelley for
"tearing them up" because the region continued to perform well on
the quality of service audits. As a result, Simpson informed Van
Bruwaene that Kelley was performing quite well. Van Bruwaene was
"elated" with Kelley's performance, agreeing that Kelley's region
was performing well as measured by the audits.
 On December 5, 1992, three and one-half months prior to
his termination, Kelley received his annual performance review from
Simpson. Airborne used the appraisals to "determine how various
people of various management levels are doing in comparison to
others of the same job." Kelley received a nine--the highest score
possible--in the "progress toward improvement" category and a
"superior rating overall." When providing Kelley recommendations
for further improvement, Simpson wrote: 
 You have made significant improve [sic] in
 1992. Service is at an all time high in
 region. Quality of service audits have been
 excellent in past few months. Driver/Owner
 costs need constant attention. 

The performance review did not mention any specific service
complaints from Boston-area companies, any problems regarding
sexual harassment, the Boston "sort" problem, Kelley's management
of the Cox situation, or any other management problems. In early
March, Kelley believed that he was performing so well that he asked
Simpson for a promotion to vice-president. 
 On March 10, 1993, the Board of Directors voted to give
Kelley stock options. The letter from the Chairman of the Company,
Robert S. Cline, stated: 
 The Directors make these awards to key
 employees who continue to grow with the
 company and who they believe are capable of
 assuming greater responsibility in the years
 ahead.
 On March 12, 1993, Robert Brazier, the President of
Airborne, received a letter from the Bose Corporation, a Boston-
based company, complaining that Airborne had failed to make a
number of deliveries. The letter recounted that, when Bose
complained to Airborne following the incident, an Airborne employee
offered the excuse that the driver had been out sick. Brazier
assumed that the problem had occurred in Boston and blamed Kelley
for this unnamed employee's incompetence. Without having
investigated the circumstances surrounding the complaint, Brazier
sent a vitriolic E-mail message to Van Bruwaene stating in part:
 This kind of stuff goes on every day when the
 regional and district management are not smart
 enough to sense it and fix it for good! I
 know you and I don't differ on Kelley, and I
 know Simpson doesn't agree with either of us. 
 I am at the point where I don't give a damn
 what Simpson thinks or for that matter anyone
 else who chooses to ignore stupidity, mediocre
 performance, poor service, or the host of ways
 that we become aware of weak management. The
 more we tolerate this the longer we condemn
 this company to be mediocre or worse . . . and
 I have had enough of it.

The service failure that prompted the Bose complaint and Brazier's
response had occurred in Milwaukee, not Boston, and was neither
Kelley's fault nor in Kelley's region. 
 On March 15, 1993, Van Bruwaene responded to Brazier, his
supervisor, agreeing with Brazier's assessment of Kelley. He
defended his own handling of the situation, saying that he and
Simpson had been discussing Kelley for some time. He protested: 
 I don't want you to believe that Bill
 [Simpson] or I for that matter, protect people
 who are not capable of doing the job.
At the same time, Van Bruwaene sent a copy of the Brazier E-mail to
Simpson, scribbling on the bottom: "[Kelley] isn't worth putting
our jobs on the line. Both of us should have known it earlier." 
 Van Bruwaene informed Brazier, after a "follow-up"
conversation with Simpson, that they had decided to terminate
Kelley within the following two weeks. Van Bruwaene also forwarded
Brazier's message to Goodwin stating: 
 Attached for your information. Bill Simpson
 will be calling you for your help on this one. 
 Hopefully we have enough data to avoid a
 wrongful termination. 
 On March 15, 1993, Simpson, although supposedly the
decisionmaker, worked with Goodwin to orchestrate the mechanics of
Kelley's dismissal. Goodwin drafted the termination letter, while
Simpson provided the information justifying the decision in a
telephone conversation and an E-mail message. At about the same
time, Goodwin admitted that he had to be careful in drafting the
termination letter because Kelley "was over forty years old." 
Goodwin created a written list of possible reasons, purportedly
obtained from Simpson by phone, which included, inter alia, (1)
"turnover of national accounts," (2) "not good with customers--no
empathy," (3) the problems with Bob Cox, (4) sexual harassment of
Betsy Tate, and (5) the intra-Boston sort problem. The list
acknowledged that Kelley's "numbers"--referring to the statistical
measures used to gauge a manager's performance--were "OK." In an
E-mail message to Goodwin dated the same day, Simpson listed the
Cox problem, the sort problem, complaints from major Boston
customers, and that Kelley went golfing too much with his managers. 
Simpson ended the E-mail by saying "that is all I can think of
right now." Three minutes later, though Kelley would be fired in
eight days, Simpson sent an E-mail to Kelley castigating him for
certain "reweigh reports" and demanding that he fix the situation. 
The next morning, Simpson forwarded Kelley's response and the
reweigh report to Goodwin, who was in the process of formulating
Kelley's termination letter, as additional evidence to justify the
coming termination. In a March 19, 1993 E-mail, Van Bruwaene wrote
a memo to Goodwin and Simpson in which he stated that "this is
going to be a messy termination." 
 On March 24, 1993, Simpson delivered to Kelley the 
termination letter, which contained five numbered paragraphs
explaining the reasons for the termination. Notably, the letter
did not mention the Bose complaint and Brazier's response. In
fact, Brazier eventually learned that Kelley had not been
responsible and testified that the incident was not the catalyst
for Kelley's termination. Instead, the letter cited the following:
(1) "a clear pattern of complaints about [Kelley] and [his]
management style . . . ."; (2) procrastination and delays in
following directions; (3) poor judgment and management behavior;
(4) his "bullish" management style; and (5) Simpson's inability
obtain information from Kelley's region and his inability to build
a team relationship with Kelley's managers. After nineteen years
of service, Kelley was informed that March 24, 1993, would be his
last day at Airborne. Kelley, then forty-six years old, was
replaced with a thirty-seven year old manager. 
 The ten-day trial was primarily devoted to whether the
reasons Airborne gave in the March 24, 1993, termination letter
were the real reasons why Airborne fired Kelley. Kelley introduced
evidence that his performance was superior, that the reasons given
in the letter were not true, but rather were carefully selected to
be unchallengeable in court, and that Airborne was biased against
older workers. Airborne contended that the reasons given in the
letter were the real reasons for Kelley's dismissal.
 The termination letter had claimed that Kelley's
performance prompted customer complaints that required Brazier, Van
Bruwaene, and another upper manager, Kent Freudenberger, to
intercede. At trial, Brazier could not provide details of any
specific instances in which he had to intercede because of Kelley,
and admitted that, when he did have to deal with customer
complaints emanating from Boston service failures, the incidents
occurred mostly before 1991. In addition, he described his
responses to customer complaints as routine sales calls and was
unable to tie any of these complaints specifically to Kelley. Van
Bruwaene could not identify specific instances when he had to
intercede because of complaints concerning Kelley. Interestingly,
Airborne chose not to call Freudenberger to testify. Although the
termination letter claimed that Simpson "had to spend more time"
dealing with customer relations and service problems in the
Northeast than other regions, Airborne's data that measured the
quality of service demonstrated the Kelley's region was performing
as well, or better, than other regions. 
 The termination letter also claimed that
"[p]rocrastination and delays in following directions and policy
[was] another serious flaw in [Kelley's] performance as a senior
operating manager." Cited as examples were complaints from Boston
customers regarding the lack of a local sort process; Kelley's
violation of company policy in hiring Cox, his brother-in-law, to
report directly to him; and his fostering an environment which
condoned sexual harassment. At trial, however, Airborne openly
denied that Kelley was fired for the sexual harassment of Betsy
Tate. Airborne's attorney said in his opening that "We're not
going to stand here and tell you that in 1993, after several years,
we're going to take it out on Mr. Kelley concerning sex harassment
. . . in the late 80s." In addition, at the time of the dismissal
decision, Simpson was not aware of any other sexual harassment
claims against Kelley. While Airborne accused Kelley of nepotism
in allowing Cox to report to him, Van Bruwaene admitted that his
son worked for Airborne. Further, Kelley had already fired Bob Cox
on February 12, 1993, after having given him sixty days to improve
his performance as the company's progressive discipline policy
required. Although Simpson had mentioned the Boston sort problem
verbally to Kelley in September 1992, there was no mention of the
problem in his December 1992 evaluation, which rated Kelley
"superior" in completing projects in a prompt manner. 
 In its termination letter, Airborne additionally claimed
that it was firing Kelley for making poor management decisions,
citing "[s]everal . . . employees [who] felt so strongly about the
unfairness of management behavior that a letter was written to the
President . . . ." The letter in question turned out to be from an
anonymous employee complaining about thefts and lack of management
at Cox's station and managers playing golf during the day. A
former FBI agent whom Airborne had hired to investigate these
allegations found the charges groundless and absolved Kelley of all
fault in regard to this incident prior to his termination.
 Further, Airborne's letter cited Kelley's "bullish"
management style. This purported aspect of Kelley's management
style was never discussed as a problem in his evaluations, and
Simpson testified that he saw Kelly "bully" someone on only one
occasion. At trial, Airborne claimed that Simpson made up his mind
to terminate Kelley in early March after meeting individually with
two sales employees, Bob Jackson and Chris Beach, who worked for
Guiod. In their meetings with Simpson, Jackson and Beach blamed
service problems and loss of revenue on Kelley. Kelley was not
informed of these meetings, nor was he given an opportunity to
respond. Simpson claimed that, as a result of these meetings, he
concluded that the relationship between sales and operations
divisions in Boston was "unbearable, and . . . that there was no
way Mr. Kelley could ever turn it around." Thus, after the
meetings, he decided to terminate Kelley. The termination letter,
however, described poor relationships between sale and operations
as "not uncommon," and did not mention the complaints from Jackson
and Beach. In short, Airborne's witnesses proffered a version of
events that often seemed in conflict with other evidence adduced at
trial, and they contradicted each other in attempting to explain
Kelley's dismissal.
 In its closing, Airborne argued that Kelley had been
terminated because he was an incompetent manager and a liar, not
because of his age. Counsel stated: "You may decide, if it had
been me, I may have not done all of those things. That is not the
issue. The issue is not whether your business judgment is the same
as Mr. Simpson's business judgment. The issue is, what does this
have to do with age? That's all there is. What does it have to do
with age?" 
 Plaintiff argued that the reasons Airborne gave for
firing Kelley were pretextual and that Airborne was biased against
older workers. Counsel reviewed the reasons Airborne gave in its
letter and argued that the testimony at trial showed that these
reasons were not true, but were fabricated to justify firing
Kelley. He argued that the reasons recited in the letter were
carefully chosen from a list of potential reasons discussed by
Goodwin and Simpson on March 15, 1993, and that those chosen were
deliberately subjective factors not capable of being easily
challenged in court. He also pointed out that there were no
employees in Kelley's region who were over the age of forty-nine.
 In charging the jury, the district court described, at
length, the controlling law under the ADEA and ch. 151B. The jury
was then provided a verdict form with Fed. R. Civ. P. 49(b)
interrogatories. Question 2 asked whether the "plaintiff proved
that his age had a determinative influence on defendant's decision
to discharge him." If the jury answered Question 2 affirmatively,
this finding was sufficient to enter judgment on both the state and
federal claims. If the jury answered Question 2 negatively, they
were to answer Question 3, which asked whether "the plaintiff has
proved that the reasons stated for discharge stated in the March
24, 1993, discharge letter were pretextual--i.e., that they were
intended to mask some other, unstated reason for the discharge." 
Question 4(a) asked whether "defendant knew the discharge was in
violation of federal law prohibiting age discrimination or acted
with reckless disregard of that law." Question 4(b) asked whether
"defendant knew or had reason to know that the discharge was in
violation of state law." The jury responded affirmatively to all
the interrogatories except Question 3, to which it appropriately
did not respond. 
 The jury awarded Kelley $253,442.08 in back pay damages,
an amount to which the parties stipulated prior to trial. The jury
also awarded $250,000 in emotional distress damages and $1,000,000
in front pay under ch. 151B, 9. After the verdict, Airborne
asked the district court to exercise its equitable power to order
that Kelley be reinstated as an "at-large RFSM," a position Airborne
said it had created for him. After a two-day hearing, on June 11,
1996, the trial court found reinstatement impracticable and
approved attorney's fees of $190,000. Airborne filed three
additional post-trial motions: a motion for judgment as a matter of
law, a motion for a new trial, and a motion for remittitur. The
trial court denied the first two motions, but granted the motion
for remittitur in part, reducing the emotional distress damages to
$150,000. Applying ch. 151B, 9, the district court endorsed the
jury's finding of willfulness and imposed a multiplier of 2.25 to
the back pay, the front pay, and the reduced emotional distress
damages. The district court explained its reasons for applying the
multiplier:
 [E]vent after event led me to believe that the
 testimony being offered by this parade of
 Airborne Express witnesses was not credible
 and that charges were being made against Mr.
 Kelley that were fanciful. 
 . . . 
 [I]t was clear to me that the discharge of Mr.
 Kelley was orchestrated deliberately and
 without restraint.
 . . .
 Mr. Simpson and Mr. Goodwin [tried] to portray
 to the jury a scenario simply contrary to
 fact. 
The district court accordingly entered judgment against Airborne in
the amount of $3,136,858 on the state claim. II.
 Discussion
 Airborne contends that various erroneous evidentiary
rulings, incorrect or inaccurate jury instructions, and questions
asked by the district court were so prejudicial to Airborne that a
new trial should be required. In addition, Airborne challenges the
award of damages under ch. 151B, 9. We consider each of these
claimed errors in turn. 
A. Evidentiary Rulings
 Appellant presents myriad evidentiary claims. We review
evidence questions for abuse of discretion. See Cohen v. Brown
Univ., 101 F.3d 155, 168 (1st Cir. 1996). 
 Airborne first contends that the trial court erred in
excluding as hearsay the particular details of customer complaints
made about Kelley to Brazier, Simpson and Guiod, which Airborne
claimed formed part of the nondiscriminatory basis for Kelley's
dismissal. Airborne argues on appeal that it offered the
complaints to show that Simpson was aware of their existence, not
"for the truth of the matter asserted," and therefore the complaints
did not constitute hearsay. See Fed. R. Evid. 801(c); United Statesv. McKeeve, 131 F.3d 1 (1st Cir. 1997). We agree that a customer
complaint offered to show, for example, that a decisionmaker had
notice of the complaint, rather than to prove the specific
misconduct alleged in the complaint, is not barred by the hearsay
rule. See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 575 (1st
Cir. 1989); see also F.T.C. v. Amy Travel Serv., Inc., 875 F.2d
564, 576 n.11 (7th Cir. 1991). We need not, however, analyze the
admissibility of Airborne's excluded complaint evidence in detail
because any error in excluding that evidence was harmless. SeeFed. R. Civ. P. 61 (requiring the reviewing court to "disregard any
error or defect in the proceeding which does not affect the
substantial rights of the parties"). Assuming, for the sake of
argument, that Airborne did offer some of the excluded evidence for
a nonhearsay purpose, Airborne successfully introduced a copious
amount of testimony and documentary evidence regarding customer
complaints of which Simpson was aware when he discharged Kelley. 
Airborne thus had ample opportunity to present to the jury its
theory that customer complaints led to Kelley's demise. The
additional testimony at issue was, at best, cumulative.
 Airborne next challenges the district court's application
of Rule 403 in a number of instances. "[E]vidence may be excluded
if its probative value is substantially outweighed by the danger of
unfair prejudice . . . or by considerations of undue delay, waste
of time, or needless presentation of cumulative evidence." Fed. R.
Evid. 403. "Only rarely--and in extraordinarily compelling
circumstances--will [this court] from the vista of a cold appellate
record, reverse a district court's on the spot judgment concerning
the relative weighing of probative value and prejudicial effect." 
Freeman v. Package Machinery Co., 865 F.2d 1331, 1340 (1st Cir.
1988). 
 First, Airborne contends that the court wrongfully
excluded, via Rule 403, certain "Leading Edge" E-mail reports that
Guiod sent to Simpson describing service failures in the Boston
area from November 1992 to March 1993 that Guiod believed could
cause revenue losses. The district court excluded the reports, in
part, because they were cumulative of other evidence concerning
customer complaints in Boston. For the same reasons stated supra,
the court was well within its discretion in making this
determination. 
 Second, Airborne challenges the district court's decision
to admit Airborne's Employee Relations Guidelines for Disciplinary
Action ("Guidelines") over Airborne's timely Rule 403 objection. 
The Guidelines contained specific progressive discipline procedures
managers were supposed to follow when faced with poorly performing
employees. Kelley introduced the Guidelines to demonstrate that
Airborne had failed to follow its own disciplinary procedures in
summarily dismissing him after nineteen years of service. To the
extent Airborne claimed to have terminated Kelley because of
incompetence, Simpson's failure to follow a written company policy
that required managers to take specific steps prior to discharging
poorly performing employees was relevant to whether Kelley's
incompetence was the true reason for his dismissal. See Powers v.
Grinnell Corp., 915 F.2d 34, 39 (1st Cir. 1990); Berndt v. Kaiser
Aluminum & Chem. Sales, Inc., 789 F.2d 253, 258 (3d Cir. 1986). In
addition, the district court admitted the Guidelines only
conditionally, instructing the jury that, if the defense offered
"testimony . . . persuad[ing] you that [the Guidelines] would not
be applicable to Mr. Kelley, [they] may not be considered in this
case as part of the evidence." We see no abuse of discretion in
the court's decision to admit the Guidelines. 
 Airborne raises a related claim that, once the district
court had admitted the Guidelines, the court wrongly prevented
Airborne from introducing rebuttal evidence that the Guidelines
often were not followed and did not apply to Kelley. The district
court did twice limit Airborne's questioning on the applicability
of the Guidelines. When Airborne attempted to elicit testimony on
cross-examination from Kelley about whether he had applied the
Guidelines during his termination of an unrelated and lower-level
employee, the court limited the inquiry stating that:
 the only issue is whether [the Guidelines]
 were applicable to [Kelley]. So, if you want
 to talk about the applicability of the
 Guidelines to regional managers, that's one
 thing; but when you start talking about
 employees to whom there's no issue, I think
 it's time not properly spent.

At recess, Airborne made an offer of proof that Kelley would have
testified that he "considered the circumstances to be emergency
circumstances; and, therefore, the Guidelines were not followed."
 Rule 611(a) of the Federal Rules of Evidence states: 
 The court shall exercise reasonable control
 over the mode and order of interrogating
 witnesses and presenting evidence so as to (1)
 make the interrogation and presentation
 effective for the ascertainment of the truth,
 [and] (2) avoid needless consumption of time .
 . .[.]

Although the proffered testimony was perhaps tangentially relevant
to the issue, the district court was frustrated by the extremely
slow pace of the trial and Airborne's circuitous presentation of
evidence. The judge was within his discretion in limiting and
focusing the scope of this inquiry in order to save time if there
was no prejudice to appellant's case. See Elgabri v. Lekas, 964
F.2d 1255, 1259-60 (1st Cir. 1992). After reviewing Airborne's
offer of proof--that Kelley may have once fired a subordinate
without following the Guidelines--we find that the exclusion of
this testimony could not have prejudiced Airborne. 
 In addition, the district court excluded testimony from
Goodwin. When Airborne attempted to question Goodwin regarding the
Guidelines, the district court interrupted and asked Airborne's
counsel whether he planned to introduce "anything remotely
different . . . than we've heard from two or three witnesses
already?" Counsel responded that the Guidelines hadn't "yet been
read." The district court then excluded the testimony as
cumulative. On the present record, however, we cannot determine
whether Airborne suffered prejudice from the district court's
exclusion of the evidence because Airborne failed to make an offer
of proof at trial describing the substance of the excluded
testimony. See Earle v. Benoit, 850 F.2d 836, 847-48 (1st Cir.
1988) (refusing to review a claim because appellant failed to make
an offer of proof pursuant to Fed. R. Evid. 103(a)(2)). At no
time did Airborne make an offer of proof that described the basic
contours of the evidence Airborne planned to introduce through
Goodwin in order to demonstrate that the Guidelines were not
applied to managers similarly situated to Kelley. As a result,
absent compliance with Rule 103(a)(2), we cannot assess the
importance of the excluded evidence. See id. at 848. We thus find
no error.
 Third, Airborne objects to the admission of age-related
comments made by Goodwin and Simpson. Kelley testified that in the
summer of 1992, less than a year before his termination, Goodwin
stated that age would be considered as a factor in selecting
employees for termination in the RIF and Simpson said it would be
a good time "to get rid of some of the older mediocre managers." 
Airborne argues that, because Goodwin did not make the termination
decision, and the statements were temporally remote and not
directed at Kelley, the judge abused his discretion by not
excluding the evidence under Fed. R. Evid. 403. We disagree.
 It is settled that statements made by decisionmakers can
evidence age discrimination. See Mulero-Rodriguez v. Ponte, Inc.,
98 F.3d 670, 676 (1st Cir. 1996). In addition, statements by
nondecisionmakers can be evidence that a discriminatory atmosphere
pervades the workplace and infects the company's personnel
decisions. See Conway v. Electro Switch Corp., 825 F.2d 593, 600
(1st Cir. 1987). Simpson's remark had a direct bearing on age
discrimination because Simpson made the decision to terminate
Kelley. Similarly, Goodwin's remark was an alleged discriminatory
statement by the head of human resources who participated closely
in Kelley's termination and was in charge of the company's
discrimination policy. Such a statement was at least admissible to
show a discriminatory atmosphere. The statements were made less
than a year before the termination while contemplating a reduction
in force. As a result, we cannot say that the temporal
relationship between the remarks and the termination was so
attenuated as to render them irrelevant. See id. at 598. While
certainly the statements "prejudiced" the defendant, all probative
evidence is prejudicial, and the district court did not abuse its
discretion in finding that the statements were not unfairlyprejudicial. 
 After reviewing Airborne's remaining evidentiary
contentions, we find them either unpreserved or without merit. 
B. Jury Instructions
 Airborne contends that the district court committed
reversible error by incorrectly instructing the jury as to the
controlling principles of employment discrimination law. Airborne
offers a host of objections: (1) the instructions incorrectly
described the plaintiff's burden of proof; (2) the trial court
erred by refusing to include instructions on business judgment, at-
will employment, the "same actor" inference, and the meaning of the
term "wrongful discharge"; (3) the trial court failed to comprehend
the difference between an age discrimination case and a wrongful
discharge case; and (4) an example that the trial court used to
explain the concept of pretext was rambling and confusing. In
Airborne's view, the cumulative effect of these errors was
sufficiently prejudicial to warrant a new trial. We disagree. 
 We begin with a brief review of the controlling
discrimination law. Because the plaintiff brought this action
pursuant to the ADEA and ch. 151B, the case involved the delicate
task of applying state and federal age discrimination laws that
differ in some important, yet subtle, respects. Under both federal
and Massachusetts law, plaintiff must first establish a prima facie
case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802 (1973); Blare v. Husky Injection Molding Sys., 646 N.E.2d
111, 116 (Mass. 1995). The burden of production then shifts to the
employer to articulate a non-discriminatory rationale for its
employment action, which rebuts the employee's prima facie case. 
St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). Under
both Massachusetts and federal law, the plaintiff at all times
bears the ultimate burden of persuading the trier of fact that the
defendant intentionally discriminated against him. See id.(quoting Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253
(1981)); Blare, 646 N.E.2d at 117. 
 Federal and state law differ, however, in the role that
pretext plays in enabling a plaintiff to meet his burden of proving
that the defendant intentionally discriminated against him. In
Hicks, the Supreme Court explained the role of pretext in federal
discrimination cases that proceed under the McDonnell Douglasburden-shifting framework:
 The factfinder's disbelief of the reasons put
 forward by the defendant (particularly if
 disbelief is accompanied by a suspicion of
 mendacity) may, together with the elements of
 the prima facie case, suffice to show
 intentional discrimination. Thus, rejection
 of the defendant's proffered reasons will
 permit the trier of fact to infer the ultimate
 fact of intentional discrimination . . . . 

Hicks, 509 U.S. at 511 (emphasis added). Thus, under the ADEA, if
the plaintiff establishes that the defendant's proffered reasons
for the adverse employment action are not the true reasons, the
trier of fact may, depending on the overall evidence, but is not
required, to infer that intentional age-based discrimination was a
determinative factor in the adverse employment action. See 
Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091-92 (1st Cir.
1995); see also Kline v. Tennessee Valley Auth., 128 F.3d 337, 343-
44 (6th Cir. 1997) (collecting cases). 
 In contrast, "Massachusetts is a 'pretext only'
jurisdiction." Blare, 646 N.E.2d at 117; Carter v. Commissioner of
Correction, 681 N.E.2d 1255, 1264 (Mass. App. Ct. 1997). Under
the "pretext only" standard: 
 [A] plaintiff who has established a prima
 facie case and persuaded the trier of fact
 that the employer's articulated justification
 is not true but a pretext, is entitled to
 judgment. 
Blare, 646 N.E.2d at 116 (emphasis added) (citing Wheelock Collegev. Massachusetts Comm'n Against Discrimination, 355 N.E.2d 309, 315
(Mass. 1976)); see also Lattimore v. Polaroid Corp., 99 F.3d 456,
465 (1st Cir. 1996) (citing Blare). The distinction matters: to
prevail under Massachusetts law, a plaintiff carries "his burden of
persuasion with circumstantial evidence that convinces the
factfinder that the [employer's] proffered explanation is not
credible." Id.; see Handrahan v. Red Roof Inns, Inc., 680 N.E.2d
568, 573-74 (Mass. App. Ct.), review denied, 684 N.E.2d 1198 (Mass.
1997); Powers v. H.B. Smith, 679 N.E.2d 252, 255 (Mass. App. Ct.
1997); see also Kline, 128 F.3d at 343 (collecting cases and
describing the "pretext only" standard). 
 We turn to Airborne's contention that the district court
incorrectly instructed the jury on the plaintiff's burden of proof
under state law. The district court described how both state and
federal law require the plaintiff to prove the same prima facie
case and explained that, under federal law, the plaintiff must
prove that age had a determinative influence on his termination. 
In addition, the court explained that if the plaintiff proved that
the defendant's stated reasons for terminating Kelley were
pretextual, the jury should enter judgment in his favor on only the
state claim. In relevant part, the district court verbally
summarized Massachusetts law as follows:
 [A] plaintiff who has established a prima
 facie case and persuaded the trier of fact
 that the employer's articulated justification
 is not true but a pretext, is entitled to
 judgment.
 . . .
 Under the federal [law], it's the plaintiff's
 obligation to prove that age discrimination
 existed. Under the state law . . . if the
 employer comes up with reasons which you find
 to be pretextual, these [sic] enough. There
 is no requirement under the state law for the
 plaintiff to prove that the reason for his
 being discharged was age. It is done in a
 different fashion. It's in combination . . .
 with the prima facie case, that he was old,
 that he was fired, there was a younger man
 hired for the job . . . [plus] the giving of a
 package of false reasons, for the discharge,
 leads the state court to conclude that the
 only reason for giving the false explanation,
 given the prima facie case, would be
 prohibited discrimination, that he was fired
 for age. 
The jury instruction thus endeavored, in simplified terms, to
distinguish between the "pretext only" standard used in
Massachusetts and the federal standard, which allows, but does not
necessarily require, a jury to find discrimination if the
defendant's reasons were pretextual--perhaps a difficult concept
for a lay jury to understand. 
 Airborne argues that the district court misstated the
plaintiff's burden of proof when it stated that "[t]here is no
requirement under the state law for the plaintiff . . . to prove
that the reason for his being discharged was his age." Airborne
thus contends that the instruction on pretext implied that Airborne
had the burden of persuasion on discrimination. 
 At first glance, the statement to which Airborne objects
appears to support their claim because Massachusetts does, of
course, require the plaintiff to prove age discrimination. The
allegedly objectionable statement, however, was part of a longer
discussion that involved not who had the burden to prove
discrimination, but how the plaintiff could meet its burden of
proving intentional discrimination under state law: by proving that
the employer's stated reasons for the discharge were not the true
reasons. The instruction, as a whole, correctly summarized
Massachusetts law in this regard. Further, the district court
stated that Kelley, not Airborne, had the burden of proof at all
times.
 Now, I keep talking about the plaintiff's
 burden. But I want it clear that the
 defendant has no burden . . . . It is not up
 to the defendant to prove that it was not his
 age that was the determinative influence, but
 it's up to the plaintiff to prove.
Reading the instructions as a whole, we see no risk that the jury
failed to understand that, under ch. 151B, the plaintiff had the
burden of proving that Airborne's stated reasons for terminating
Kelley were not the true reasons. 
 Although Airborne suggests that Massachusetts is not a
"pretext only" jurisdiction, that claim is directly contrary to
Blare and its progeny. Under ch. 151B, Kelley had to prove that it
was more likely than not that Airborne's stated reasons for
discharging him were a pretext. See Lehman v. Prudential Ins. Co.
of America, 74 F.3d 323, 327 (1st Cir. 1996) (citing Blare, 646
N.E.2d at 118). Although perhaps inartful at times, the
instruction adequately described state law. Airborne's counsel,
despite repeated colloquies with the judge, simply refused to
accept that Massachusetts is a "pretext only" jurisdiction. The
district court correctly refused Airborne's invitation to misread
state law.
 Airborne contends, second, that the court's refusal to
provide a business judgment instruction at Airborne's timely
request constitutes reversible error. Airborne argues that a new
trial is necessary because the cumulative effect of the court's
inaccurate pretext instruction and the lack of a business judgment
instruction left the jury with the "clear impression that it could
substitute its judgment for Airborne's" and prevented the jury from
"understanding Airborne's legal theory on the controlling issues of
the case (the state of mind of the decisionmaker)."
 "In reviewing a court's decision not to give a particular
instruction, our duty is to determine whether the instructions as
given tend to confuse or mislead the jury with regard to the
applicable principles of law." Poulin v. Greer, 18 F.3d 979, 983
n.3 (1st Cir. 1994). While perhaps a business judgment instruction
might have been useful in this case, its omission does not provide
a basis for undermining the adequacy of the charge as a whole. We
cannot see how the jury could have thought that it was free to find
that age had a determinative influence on Kelley's discharge if it
merely disagreed with Airborne's business judgment. The district
court instructed the jury, on more than one occasion, that Kelley
could prevail on his federal claim only if he proved by a
preponderance of the evidence that the he would not have been fired
but for his age. Interrogatory number 2, which the jury answered
affirmatively, asked "has the plaintiff proved that his age had a
determinative influence on defendant's decision to discharge him?" 
These instructions did not permit or suggest that the jury could
predicate a finding of age discrimination on their disagreement
with Airborne's business judgment. Similarly, we cannot agree that
the instruction prevented the jury from focusing on the state of
mind of the decisionmaker. The district court said:
 Here, the issue has to do with motive, state
 of mind. . . . [Y]ou're looking into the
 state of mind of the defendant company in
 discharging the plaintiff. It is a state of
 mind that existed or did not exist at the time
 of discharge.
These instructions adequately framed the only important question. 
Thus, we find no error in the decision of the district court not to
give a business judgment instruction. 
 Even if Airborne's argument prevailed under federal law,
the damages awarded via ch. 151B would still stand. Airborne does
not suggest that the failure to provide the business judgment
instruction constitutes reversible error under Massachusetts law. 
Thus, the absence of the business judgment instruction has no
effect on the defendant's liability under ch. 151B.
 Airborne's third contention is that the district court's
failure to include an "at-will" instruction and the "same actor
inference" instruction provides a basis for vacating the jury's
verdict. Although a district court may be allowed to use these
instructions in appropriate circumstances, see Achor v. Riverside
Golf Club, 117 F.3d 339, 341 (7th Cir. 1997) ("[W]e doubt [the at-
will instruction] should have been given, and we are confident that
they should not have used . . . formal terminology."), Buhrmasterv. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir. 1995)(holding
that including the "same actor inference" in a jury instruction does
not constitute reversible error), we are confident that the absence
of these instructions could not have confused or misled the jury as
to the controlling law.
 Airborne claims a number of additional errors that
warrant little discussion. The claim that Judge Garrity confused
a wrongful discharge claim with Kelley's discrimination claim is
without merit. The district court used the phrase "wrongful
discharge" loosely at one or two points in the ten-day trial and
twice in the jury instructions when discussing the calculations of
damages, and there was some testimony that utilized the term. 
After reviewing the record as a whole, however, we discern no
danger that the jury could have confused Kelley's ADEA and ch. 151B
age discrimination claims with a contract-based wrongful discharge
claim, see, e.g., Upton v. JWP Businessland, 682 N.E.2d 1357 (Mass.
1997). Nor was the district court required to define wrongful
discharge when there was no contract-based claim. To do so might
have confused the jury.
 Airborne's objection to the district court's resort to an
analogy to demonstrate the difference between state and federal
pretext analyses also fails. To illustrate the meaning of pretext,
the court used the example of a couple, in which one spouse tells
the other spouse that he or she is going to the store to get milk,
when in fact, he or she is going to buy cigarettes as well and
wants to conceal this fact. Airborne's only objection to the
analogy at trial was that it "created the impression" that, under
state law, the jury's finding of pretext was sufficient to find
intentional discrimination. As the jury's finding of pretext was,
in fact, sufficient to enter judgment on the state claim, we fail
to see how the analogy constitutes reversible error. We need not
consider Airborne's other arguments, that the analogy shifted the
burden of proof and placed the jury in the position of being a
"super-personnel agency," because Airborne failed to raise these
concerns before the district court. See La Amiga del Pueblo, Inc.
v. Robles, 937 F.2d 689, 692 (1st Cir. 1991). 
 The instructions adequately explained the controlling
discrimination law to the jury. We "customarily cede wide
discretion to trial courts to fashion jury instructions as they see
fit and we see no reason to second-guess the court in this
instance." Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir. 1996)
(citations omitted).
C. The District Court's Questioning of Witnesses
 Airborne claims it suffered prejudice because the
district court improperly commented on the evidence and
interrogated the witnesses during the course of the trial. In
particular, Airborne argues that the district court improperly
trivialized Simpson's opinions regarding customer concerns and
wrongfully criticized Guiod's business judgment. After reviewing
the record, we conclude that Airborne failed to object properly to
the district court's questions. 
 "Federal Rule of Evidence 614(c) provides that
 objections to the interrogation of witnesses
 by the court may be made at the time of the
 interrogation or at the next available
 opportunity when the jury is not present. . .
 . If a party fails to object to the court's
 interrogation of a witness at trial, his
 objection will not be reviewed on appeal."
Stillman v. Norfolk & Western Ry. Co., 811 F.2d 834, 839 (4th Cir.
1987). In this case, Airborne's counsel did not object to the
district judge's questioning of witnesses during the trial, either
in front of the jury or when the jury was not present. The
district court has the undisputed right to question witnesses at
trial, see United States v. Henry, __ F.3d __, 1998 WL 38009 (1st
Cir. 1998), and proper objections are vital in order to assist the
district court in ensuring that its participation is not unfairly
prejudicial to one side. Thus, we will not review Airborne's claim
that the district court's questions here constitute prejudicial
error. IV.
 Damages
 Finally, Airborne challenges the $1,000,000 front pay
award under the ADEA and ch. 151B. Airborne advances four
arguments: (1) that the district court abused its discretion in
finding that reinstatement was impracticable or impossible; (2) the
front pay jury instruction was inadequate; (3) the evidence was
insufficient to sustain the jury's award; and (4) the district
court improperly multiplied the jury front pay award pursuant to
ch. 151B, 9. We disagree and affirm the front pay award. 
A. Reinstatement
 In his complaint, plaintiff's request for damages
included a request for reinstatement or front pay. On the first
day of trial, the district court asked the defendant whether it
could take a position on reinstating Kelley; the defendant
declined. After the jury awarded $1,000,000 in front pay, Airborne
filed a post-trial motion asking the district court to order Kelley
reinstated. Airborne suggested that, because Kelley's RFSM
position was filled, the district court could order that Kelley
return to a specially created position of "at-large" RFSM, which it
claimed offered compensation, benefits, and responsibilities
similar to the position which Kelley had lost. Kelley would work
for Simpson, his supervisor prior to his termination. Airborne
reasoned that, because it was now "willing to reinstate Mr. Kelley
as a result of the jury's finding that it acted wrongfully in
terminating his employment, Mr. Kelley is not entitled to front
pay." 
 The district court conducted two days of hearings on the
legal and practical aspects of reinstatement, which included the
receipt of additional testimony from Goodwin and a proffer from
counsel describing the proposed position. The district court found
that reinstatement was "impracticable in the extreme" and therefore
awarded front pay under both the ADEA and ch. 151B, 9. 
 Airborne contends that the district court abused its
discretion because (1) Kelley failed to show that his relationship
with Simpson, his immediate superior, was hostile, (2) and that the
trial court's findings were unsupported by the evidence. Under the
ADEA, though the district court has equitable power to award front
pay when plaintiff has "no reasonable prospect of obtaining
comparable alternative employment," Powers, 915 F.2d at 42
(citation and quotation omitted), future damages should not be
awarded unless reinstatement is impracticable or impossible. 
Wildman v. Lerner Stores Corp., 771 F.2d 606, 615 (1st Cir. 1985). 
The district court has broad discretion to determine precisely how
to compensate the injured plaintiff fully, see Selgas v. American
Airlines, Inc., 104 F.3d 9, 13 (1st Cir. 1997), and, given its
ability to directly observe the litigants, it is in a far better
position than an appeals court to judge the quality of their
relationship, an important factor in determining the viability of
reinstatement. See Wildman, 771 F.2d at 615. On appeal, an order
denying reinstatement will be disturbed only when the reviewing
court is left "with a definite and firm conviction that a mistake
has been made." Graefenhain v. Pabst Brewing Co., 870 F.2d 1198,
1201 (7th Cir. 1989).
 The district court based its decision on the
considerable antipathy Airborne's top management held for Kelley,
antipathy that the district court found went beyond the "animosity
engendered by th[e] litigation." As the district court explained,
Brazier disliked Kelley prior to the litigation; the other
management staff had effectively vilified Kelley, which completely
undermined his value as a manager; and Kelley's supervisor would be
the man who had signed his termination letter--a termination the
court described as "deliberately manufactured" without restraint. 
Further, the district court did not trust Airborne's reinstatement
offer or their intentions. The court described the motion asking
the court to reinstate Kelley as "just another strategic move" and
found that the proposed "at-large" position was indefinite and
"make-work."
 The district court thus expressed deep concerns in its
determination that Kelley's reinstatement to Airborne was
impracticable. Given these stated reasons, we find the refusal to
order reinstatement well within the court's discretion and amply
supported by the record. See Maxfield v. Sinclair Intern., 766
F.2d 788, 795 (3d Cir. 1985) (noting that reinstatement may be
inappropriate if animosity has damaged the relationship between the
parties); Cancellier v. Federated Dep't Stores, 672 F.2d 1312 (9th
Cir. 1982) (similar). 
B. The Front Pay Instruction
 Airborne next contends that the district court
incorrectly instructed the jury on how to calculate front pay
damages. Within federal employment discrimination law, front pay
is generally an equitable remedy awarded by the court, see Lussierv. Runyon, 50 F.3d 1103, 1108 (1st Cir. 1995), while, under ch.
151B, the jury awards front pay, see Handrahan, 680 N.E.2d at 576. 
The district court thus submitted the issue of front pay to the
jury. Airborne argues that, due to the district court's inadequate
instructions on how the jury was to calculate front pay, the award
should be vacated or, in the alternative, remanded for a further
hearing. We disagree. 
 "Our principal focus in reviewing jury instructions is to
determine whether they tended to confuse or mislead the jury on the
controlling issues." Service Merchandise Co., Inc. v. Boyd Corp.,
722 F.2d 945, 950 (1st Cir. 1983). We look to state law governing
the award of front pay damages to determine if the jury charge was
proper. See DaSilva v. American Brands, Inc., 845 F.2d 356, 362
(1st Cir. 1988). In Massachusetts, front pay is considered a form
of compensatory prospective damages, akin to future damages in the
tort context. See Conway, 523 N.E.2d at 256-57. Massachusetts law
requires that front pay awards not be speculative, that they be
causally related to the wrongdoing, and that the plaintiff not be
made more than whole. See id. at 527. 
 Airborne argues that the instruction was legally
deficient because the district court failed to instruct the jury
(1) to consider other relief that Kelley might recover and his
prospects for obtaining comparable alternative employment and for
continuing at Airborne in light of his health; (2) to consider
whether his job would remain in existence given Airborne's economic
future; and (3) to reduce front pay as much as necessary to keep
Kelly from being overcompensated. We disagree. 
 While some of Airborne's proposed instructions may have
been useful, Massachusetts law does not suggest that the district
court abused its discretion in not using Airborne's proffered
instructions. What Massachusetts authority there is on front pay
instructions indicates that the charge here was adequate. SeeBoothby v. Texon, 608 N.E.2d 1028, 1039 (Mass. 1993) (approving
front pay instruction in wrongful discharge case that jury could
use its "common sense" in formulating a front pay award); Griffinv. General Motors Corp., 403 N.E.2d 402, 405 (Mass. 1980)(approving
instruction that the "plaintiff was 'entitled to her past and
future impaired earning capacity'"). The district court adequately
described the controlling legal principles; thus, we find no abuse
of discretion. 
C. The Sufficiency of Evidence on Front Pay Damages
 Airborne challenges the jury's $1,000,000 front pay award
under ch. 151B, arguing that the award is speculative and not
supported by record evidence. In its post-trial motions, Airborne
moved pursuant to Fed. R. Civ. P. 59 for remittitur of the front
pay award and for a new trial. The district court denied both
motions. The trial judge has "discretion to grant a new trial if
the verdict appears to [the judge] to be against the weight of the
evidence," Gasperini v. Center for Humanities, Inc., 116 S. Ct.
2211, 2222 (1996) (citations and quotations omitted), or to order
remittitur of the award in light of the evidence adduced at trial,
see Conde v. Starlight I, Inc., 103 F.3d 210, 212 (1st Cir. 1997). 
"[T]he role of the district court is to determine whether the
jury's verdict is within the confines set by state law . . . . [We]
then review the district court's determination under an
abuse-of-discretion standard." Browning-Ferris Ind., Inc. v. Kelco
Disposal, Inc., 492 U.S. 257, 279 (1989).
 We consider the damages evidence in the light most
favorable to Kelley. See Vera-Lozano v. International
Broadcasting, 50 F.3d 67, 71 (1st Cir. 1995). 
 The proper front pay award was a hotly contested issue
at trial and both sides introduced competent expert testimony on
the issue. Plaintiff's expert estimated front pay damages to be
$1,531,631 if Kelley worked at Airborne until age 60, $1,869,211
until age 62, and $2,377,482 until age 65. Airborne's expert
calculated that Kelley would suffer $360,000 worth of front pay
damage by age 55, but chose not to project beyond that age. 
 Airborne contends that we must vacate the jury verdict
because Kelley presented no statistical evidence or other data that
justified the expert testimony calculating Kelley's damages until
age 60 and beyond. We disagree. "[A]n award of front pay,
constituting as it does, an estimate of what a plaintiff might have
earned had s/he been reinstated at the conclusion of trial, is
necessarily speculative." Selgas, 104 F.3d at 14 n.6. 
Massachusetts law is clear that uncertainty in the award of future
damages does not bar their recovery, and we have said that the
"'[g]enerousness of a jury's award does not alone justify an
appellate court in setting it aside' [unless] it is shown to exceed
any rational appraisal or estimate of the damages . . . ." Linn,
874 F.2d at 6 (quoting Kolb v. Goldring, Inc., 694 F.2d 869, 781
(1st Cir. 1982)). 
 There was sufficient evidence before the jury from which
it could rationally have found $1,000,000 in front pay damage. 
Kelley intended to work at Airborne for the rest of his life; when
Airborne fired Kelley, he was six years away from becoming fully
vested in the company's pension plan; and Airborne's stated
retirement age was sixty-five. Both experts agreed that, without
a college education, it would have been extremely difficult for
Kelley to obtain a comparable salary. In addition, the jury
awarded only about two-thirds of the front-pay damages the
plaintiff's expert calculated Kelley would suffer had he worked
until he was sixty-years old. On these facts, the district court
did not abuse its discretion in declining remittitur.
D. The Discretionary Multiplier
 Airborne finally contends that the district court
improperly imposed the discretionary multiplier contained in ch.
151B, 9 on Kelley's front pay and emotional distress damages. 
In the relevant part, the statute states: 
 Any person claiming to be aggrieved by a
 practice concerning age discrimination in
 employment . . . may bring an action under
 this section for damages or injunctive relief
 or both . . . . If the court finds for the
 petitioner, recovery shall be in the amount of
 actual damages; or up to three, but no less
 than two, times such amount if the court finds
 that the act or practice complained of was
 committed with knowledge, or reason to know,
 that such act or practice violated the
 provisions of said section four. 
Mass. Gen. Laws ch. 151B, 9 (emphasis added). After declining to
order Kelley's reinstatement, the district court imposed a
multiplier of 2.25 on the jury's award of back pay, front pay, and
emotional distress damages in light of the jury's responses to the
verdict form.
 Airborne contends that settled principles of statutory
construction and policy considerations indicate that emotional
distress and front pay damages are not within the definition of
actual damages subject to the discretionary multiplier. We
disagree. 
 Airborne's first contention, that emotional distress
damages are not actual damages, is incorrect. We note that in
Fontaine v. Ebtec Corp., 613 N.E.2d 881, 883 & n.4 (Mass. 1993),
the Supreme Judicial Court affirmed without comment the
multiplication of an award of emotional distress damages pursuant
to 9. In addition, Massachusetts courts award emotional distress
damages routinely in age discrimination cases pursuant to ch. 151B,
 9. See, e.g., Powers v. H.B. Smith Co., Inc., 679 N.E.2d 252, 257
(Mass. App. Ct. 1997). 
 Airborne's second contention, that front pay is not a
type of actual damages, is a question that has not been explicitly
answered in Massachusetts. The plain meaning of the language used
in ch. 151B makes clear, however, that front pay comes within the
ambit of actual damages. In 1989, the Massachusetts legislature
authorized the recovery of punitive damages in discrimination cases
successfully brought under the chapter by adding the following
provision to the third paragraph of 9: "If the court finds for
the petitioner, it may award the petitioner actual and punitivedamages." Fontaine, 613 N.E.2d at 887 & n.9 (emphasis added)
(quoting St.1989, ch. 722, 31). In 1990, the legislature amended
the fourth paragraph of 9 to provide for multiple damages
specifically in cases of age discrimination by adding the
following: "recovery shall be in the amount of actual damages; or
up to three, but not less than two, times such amount if" the act
was committed with knowledge that it violated the statute. Id.(quoting St.1990, ch. 395) (emphasis added). The phrase "actual
damages" must have a consistent meaning throughout ch. 151B, and
the provision appears to distinguish between actual damages and
punitive damages in discrimination cases. In Massachusetts, front
pay is compensatory in nature, not punitive. See Handrahan, 680
N.2d at 576. It thus follows that front pay must fall within the
definition of actual damages subject to the discretionary
multiplier. Cf. DiMarzo v. American Mut. Ins. Co., 449 N.E.2d
1189, 1200 (Mass. 1983) (defining "actual damages" in Mass. Gen.
Laws ch. 93A, to include "all losses which were the foreseeable
consequences" of the unlawful conduct). 
 Airborne's reading of ch. 151B, 9 is implausible. The
fourth paragraph of 9 authorizes the award of damages in 
discrimination cases by stating that "recovery shall be in the
amount of actual damages . . . ." The provision contains no other
authorization for the award of damages. Under Airborne's proffered
definition, an age discrimination victim could never recover front
pay because the loss of future pay would not be actual damage, and
thus there would be no statutory basis on which to award it. The
SJC, however, has explicitly held that 9 authorizes the award of
front pay. See Conway, 523 N.E.2d at 256-57. Therefore, front pay
must be actual damages. The district court correctly found that
the front pay award was subject to the discretionary multiplier. 
 V.
 For the reasons set forth above, the judgment of the
district court is affirmed. Costs to appellee.